OPINION
{¶ 1} Defendant-appellant, EarthLink, Inc. ("EarthLink"), appeals from the Franklin County Court of Common Pleas' denial of its motion for directed verdict and grant of judgment in favor of plaintiff-appellee, RFC Capital Corporation ("RFC"). For the following reasons, we reverse the judgment in favor of RFC and remand.
 {¶ 2} The genesis of this case lies in the Loan and Security Agreement RFC and non-party Internet Commerce Communications, Inc. ("ICC") executed on May 22, 2000.[1] At the time ICC executed the Loan and Security Agreement, it was a publiclytraded corporation that provided internet access, among other internet services, to its customers. RFC was, and is, a finance company focused on lending money in the telecommunications, energy and technology industries.
 {¶ 3} Pursuant to the Loan and Security Agreement, RFC agreed to loan ICC up to $12 million of working capital. RFC structured the loan as a revolving line of credit, allowing ICC to borrow at a rate of three times the amount of monthly revenues received into a lockbox account under RFC's control.
 {¶ 4} To secure the loan, ICC granted RFC a security interest in, among other assets:
[A]ll of [ICC's] customer base, which shall include but not be limited to all of [ICC's] past, present and future customer contracts, agreements, lists, documents, computer tapes, letters of agency or other arrangements, any customer list relating thereto and any information regarding prospective customers and contracts, agreements, goodwill and other intangible assets associated with any of the foregoing (herein the "Customer Base") * * *.
Loan and Security Agreement, Section 12(a)(vi). RFC protected this security interest by mandating that ICC could not "further sell, assign, transfer, pledge, hypothecate, mortgage or otherwise encumber any right or rights with respect to the Collateral or any rights or interests thereunder absent the express written consent of [RFC]." Loan and Security Agreement, Section 14(d).
 {¶ 5} One day after RFC and ICC executed the Loan and Security Agreement, RFC filed a UCC-1 financing statement with the Colorado Secretary of State and the Denver County Recorder's Office. The UCC-1 financing statement identified those assets in which RFC had a security interest, including the customer base.[2]
 {¶ 6} By late 2000, ICC was experiencing financial trouble and began working with a broker to sell its dial-up internet access customer base ("customer base"). ICC's broker contacted Cliff Bryant, EarthLink's Director of Acquisitions, and inquired whether EarthLink[3] would be interested in buying ICC's customer base. Mr. Bryant expressed interest, and visited ICC's headquarters in January and March 2001 to pursue a possible purchase. During the March 2001 meeting, ICC executives and Mr. Bryant discussed the size of the customer base. Charles Eazor, ICC's Senior Vice President of Operations, drafted and gave Mr. Bryant a document in which ICC represented that 124,926 dial-up users logged onto the internet via ICC's system and 97,338 active dial-up customers were in the ICC billing systems. ICC also provided Mr. Bryant with a breakdown of ICC dial-up customers by region showing that ICC had a total of 100,728 customers.
 {¶ 7} On March 15, 2001, ICC and EarthLink executed a contract entitled "Agreement by EarthLink Enterprises, Inc. to Acquire the Dial-Up Subscriber Business of Internet Commerce 
Communications, Inc." ("EarthLink Agreement"). Pursuant to the EarthLink Agreement, ICC agreed to deliver its customer base to EarthLink and EarthLink agreed to pay a "bounty" of $190 for each ICC dial-up customer who transferred his or her business to EarthLink and paid for either dial-up or web hosting service for two consecutive months. In Exhibit A to the EarthLink Agreement, ICC represented that it had 97,000 customers who could transfer to EarthLink. Thus, if all 97,000 customers transferred to EarthLink and paid for two months of service, EarthLink would pay ICC a total of $18,430,000.
 {¶ 8} Because the parties would not be able to determine the total purchase price until months after signing the EarthLink Agreement, they agreed that EarthLink would make multiple partial payments to ICC. The first two payments were each to be $4,607,500, or 25 percent of the estimated total purchase price. The parties calculated this amount by multiplying the $190 bounty by the number of ICC customers set forth in Exhibit A — 97,000 — and dividing by four [($190 x 97,000 customers) / 4 = $4,607,500]. The EarthLink Agreement called for the first payment to be made within 24 hours of the execution of the EarthLink Agreement[4] and the second to be made within 48 hours of the transfer of the customer base. Thereafter, EarthLink would make any additional payments, if necessary, on a monthly basis.
 {¶ 9} The EarthLink Agreement further stated that:
RFC Corporation, pursuant to a Loan and Security Agreement with RMI.NET (now, Internet Commerce Communications, Inc.) dated May 22, 2000, has a senior secured lien on all customers, revenue, assets, and real or personal property associated with the Transferred Customer Base. RFC has agreed to waive any security interest, lien, or encumbrance in the Transferred Customer Base, and execute any necessary documents, in order to allow this Agreement to be executed, and performed under in full by ICC. EarthLink Agreement, Exhibit A, Section D. This provision was added to the EarthLink Agreement when Douglas Hanson, ICC's Chairman and CEO, telephoned Mr. Bryant immediately before the parties executed the EarthLink Agreement and informed him that RFC had a security interest in the customer base. Mr. Bryant asked if RFC knew of the proposed sale of the customer base, and Mr. Hanson assured him that RFC knew of the sale and had agreed to release the collateral.
 {¶ 10} Mr. Bryant believed that Section D protected EarthLink from any claims RFC could have on the customer base. Thus, neither Mr. Bryant nor any other EarthLink employee contacted RFC or conducted a search of UCC filings to determine whether RFC filed a UCC-3 filing statement releasing its security interest.
 {¶ 11} Meanwhile, RFC was unaware of the pending deal until March 13, 2001, when Jon Steging, ICC's Chief Financial Officer, telephoned Clint Mitchell, who was then RFC's Senior Credit Manager. Mr. Steging forwarded Mr. Mitchell a draft of the EarthLink Agreement and requested that RFC provide ICC a letter releasing its security interest in the customer base. In response, Mr. Mitchell told Mr. Steging that RFC would only release its security interest if ICC paid off its loan or paid down the loan by an amount equal to the value of the customer base. Mr. Mitchell also informed Mr. Steging that the EarthLink Agreement should not include the false representation that RFC already agreed to release its security interest.
 {¶ 12} Dissatisfied with RFC's refusal to provide an outright release of its security interest, Mr. Hanson, ICC's Chairman and CEO, emailed Richard Rudek, RFC's President, and informed him that the sale of the customer base was necessary for ICC's survival. In response, Mr. Rudek did not agree to an outright release of RFC's security interest, but he did agree to conduct a financial review of ICC to determine the exact parameters under which RFC might release its security interest.
 {¶ 13} Thus, at the time ICC and EarthLink executed the EarthLink Agreement, RFC was considering the release of its security interest, but it had not agreed to do so. Nevertheless, ICC stated in the 10K Form filed with the Securities and Exchange Commission on March 30, 2001 that, "[w]e have received approval from RFC Capital Corporation, our lender under a revolving line of credit, regarding their release of any lien they may have on [the] portion of our business [sold to EarthLink]."
 {¶ 14} After RFC's financial review of ICC, RFC drafted the "Second Amendment to the Loan and Security Agreement" ("Second Amendment") to address the sale of the customer base. RFC and ICC executed the Second Amendment on April 2, 2001. Section 11 of the Second Amendment provided that:
The Lender hereby consents to the sale of the Purchased Accounts by [ICC]. Upon the performance by [ICC] and [its wholly-owned subsidiary] of all their obligations under the Loan Agreement and this Amendment, the Lender agrees to release its security interest in the Purchased Accounts.
 {¶ 15} Among ICC's obligations under the Second Amendment was making principal payments so that the loan amount outstanding equaled only 1.75 times the monthly revenues received into the RFC-controlled lockbox account.[5] See Second Amendment, Section 12. At the time RFC and ICC entered into the Second Amendment, RFC expected that ICC would meet this obligation by transferring to RFC money from the sale of the customer base. Indeed, in April 2001, ICC paid down the loan by $2.3 million with funds obtained from EarthLink's first payment. RFC estimated that ICC would have to pay at least another $2.4 million to comply with its obligation under Section 12 to pay down the loan amount.
 {¶ 16} Neither ICC nor RFC informed EarthLink of the Second Amendment. In fact, Mr. Hanson forbade RFC from contacting EarthLink. Despite RFC's knowledge that EarthLink expected the customer base to be delivered free and clear of any security interest, RFC followed Mr. Hanson's instructions.
 {¶ 17} On May 3, 2001, EarthLink received the first of many customer databases from ICC. This database included 103,845 entries, with each entry purportedly representing a unique log-in name and email address. EarthLink, however, found this database deficient because it contained inaccurate information, it did not provide all the necessary information for each customer and it included duplicate entries. EarthLink estimated that the database included only 80,000 legitimate customers.
 {¶ 18} When Mr. Bryant, EarthLink's Director of Acquisitions, was informed of the deficient quality of the database, he decided EarthLink would only remit $2,992,500 of the second payment called for in the EarthLink Agreement. Mr. Bryant knew that under the EarthLink Agreement, ICC was entitled to a second payment equaling 25 percent of the total purchase price, which would bring the percentage of the total purchase price paid to 50 percent. Therefore, Mr. Bryant reasoned that because ICC had only 80,000 (not 97,000) customers who might transfer, EarthLink only owed enough money so that the total of the first and second payments would equal $7.6 million or 50 percent of the total payment for 80,000 customers. As EarthLink had already made a $4,607,500 first payment, EarthLink only made a $2,992,500 second payment to ICC ($4,607,500 + $2,992,500 = $7,600,000).
 {¶ 19} After receiving the $2,992,500 second payment on May 8, 2001, ICC transferred approximately $1.5 million of it to RFC. This payment did not satisfy ICC's obligation under the Second Amendment to pay down its loan so that the amount outstanding equaled only 1.75 times the monthly revenues received into the RFCcontrolled lockbox account. Accordingly, RFC did not release its security interest in the dial-up customer base. Nevertheless, neither ICC nor RFC communicated this fact to EarthLink, and the transition of the customer base continued unabated.
 {¶ 20} On June 12, 2001, Mr. Eazor, ICC's Senior Vice President of Operations, sent a letter to Mr. Bryant expressing his displeasure with the slow pace at which EarthLink was transitioning the customer base. News of EarthLink's purchase of the customer base had become public, and Mr. Eazor was worried that competitors were using the uncertainty caused by the sale to poach customers. EarthLink responded to Mr. Eazor's concerns by engineering a face-to-face meeting between the ICC and EarthLink employees who were working on the transition. Moreover, EarthLink sent William Neves, a Senior Integration Manager, to ICC's headquarters to ease the transition.
 {¶ 21} From May to August 2001, ICC and EarthLink employees worked to "clean up" the information contained in the ICC customer databases. During this time period, EarthLink grew increasingly concerned that the number of ICC customers were much less than ICC represented, particularly when ICC disclosed that its radius server counted only 62,361 unique log-ins to its network during a four month period. Further, EarthLink discovered that approximately 20,000 of the customers ICC included within the database were email-only customers who, by the terms of the EarthLink Agreement, EarthLink had not agreed to take or pay for.
 {¶ 22} As part of the transition, ICC emailed its dial-up customers on July 5, 2001 and officially informed them that ICC would be transferring their accounts to EarthLink. In this email, ICC told its customers that an EarthLink account would be automatically created for them, unless they notified ICC otherwise. Further, ICC assured its customers that EarthLink would allow them to retain their current email addresses.
 {¶ 23} Then, on July 23, 2001, Mr. Hanson, ICC's Chairman and CEO, telephoned Mr. Bryant, EarthLink's Director of Acquisitions, and told him that ICC was so far in arrears in paying its network vendors that the vendors were going to shut off the network on July 27. If the network shut down, all of ICC's customers would lose their internet access and EarthLink would not be able to transition them to EarthLink's system. Mr. Hanson asked Mr. Bryant to wire ICC $2 million so ICC could pay its network vendors.
 {¶ 24} Rather than give ICC $2 million, EarthLink decided to try to transition the ICC customers without ICC's participation. To do this, EarthLink had to prematurely load the ICC customer databases into its centralized customer base and billing system so that it could directly email the customers and mail them welcome kits. Beginning on July 27, 2001, EarthLink loaded the customer databases and sent the approximately 66,000 ICC customers in the databases a welcome email. The email informed the ICC customers to look for welcome kits in the mail that would include EarthLink software, as well as the customer's new username and password. Importantly, the email stated that ICC customers would not be able to keep their current email addresses.
 {¶ 25} ICC discovered that EarthLink was sending this email on July 28, 2001 and immediately sent its own email informing its customers that EarthLink's email was in error and that they would be able to retain their current email addresses. These dueling emails created customer confusion, and ICC's Customer Service Center was inundated with telephone calls and emails throughout the week after the emails were sent. During that week, approximately 4,000 ICC customers cancelled their service. Mr. Neves, EarthLink's employee at ICC headquarters, estimated that of these 4,000 cancellations, 3,200 to 3,500 were due to EarthLink's email.
 {¶ 26} ICC, meanwhile, did not lose its network connection. To forestall its vendors, ICC declared bankruptcy on July 31, 2001.
 {¶ 27} Throughout August 2001, EarthLink continued to integrate the ICC customer databases into its own database and correct inaccurate ICC customer information. EarthLink was also busy adding ICC points of presence, or POPs, to its system. A POP houses equipment that enables a dial-up internet user to access a remote server via a local phone number. Adding ICC's POPs into its system enabled EarthLink to offer dial-up service to the more far-flung ICC customers. However, EarthLink decided not to incorporate five of ICC's POPs into its system, and thus, EarthLink could not offer dial-up service to an estimated 6,000 ICC customers.
 {¶ 28} Ultimately, EarthLink loaded approximately 85,000 ICC customers into its own customer and billing database.[6]
This number did not include an estimated 10,000 customers EarthLink was first informed about in late August. EarthLink decided not to load these customers because it considered the customer information ICC provided for these customers questionable.
 {¶ 29} On September 11, 2001, EarthLink "cut over" internet access for the approximately 85,000 ICC customers from ICC's system to EarthLink's system. As of September 22, 2001, only 27,708 of these ICC customers had logged onto EarthLink's system. The majority of the accounts EarthLink set up for the approximately 85,000 ICC customers were cancelled. EarthLink generated a "User Count Summary" from its customer and billing database to show the ICC customers' rate of and reasons for cancellation. According to this summary, EarthLink itself initiated the majority of the cancellations due to non-payment. Additionally, a significant number of ICC customers initiated cancellation themselves because they simply did not want their account to be acquired by EarthLink or they were dissatisfied with the transition process. Ultimately, only 25,144 former ICC customers paid EarthLink for either dial-up or web hosting service for two consecutive months.
 {¶ 30} Because EarthLink had paid for 40,000 customers,[7] but only received 25,144 customers, EarthLink determined that it did not owe ICC any further payments. By late September 2001, RFC knew that it could not count on any more payments from EarthLink to pay down ICC's loan. Thus, RFC turned to recouping what amounts it could from the liquidation of ICC in bankruptcy. As a secured creditor, RFC ultimately received $2 million from the bankruptcy, resulting in an unpaid loan balance of $4 million.
 {¶ 31} On May 24, 2002, RFC filed suit against EarthLink, alleging conversion, tortious interference with a contractual relationship, unjust enrichment, impairment of RFC's security interest, and a right to an accounting. RFC claimed that, as a secured party, it was entitled to a recovery from EarthLink because EarthLink took and damaged its collateral without obtaining a release.
 {¶ 32} The parties tried the case to a jury from June 3 to June 19, 2003. Prior to beginning its case, EarthLink moved for directed verdict and the motion was denied. The case was submitted to the jury, which found EarthLink liable and awarded RFC $6 million. On June 23, 2003, the trial court entered judgment for RFC in the amount of $6 million plus post-judgment interest. EarthLink then filed this appeal.
 {¶ 33} On appeal, EarthLink assigns the following errors:
1. The trial court erred in denying EarthLink's directed verdict motion with respect to its consent defense, given the unrebutted evidence of RFC's explicit and implicit consent to the EarthLink-ICC transaction.
2. The trial court erred in denying EarthLink's directed verdict motion with respect to RFC's conversion claim, given the absence of a demand for return of the collateral by RFC, and the fact that EarthLink came into possession of the collateral lawfully.
3. The trial court erred in denying EarthLink's directed verdict motion with respect to RFC's tortious interference claim, given RFC's failure to prove four of the five elements of the claim.
4. The trial court erred in denying EarthLink's directed verdict motion with respect to RFC's unjust enrichment claim, given RFC's failure to prove any of the elements of the claim.
5. The trial court erred in denying EarthLink's directed verdict motion with respect to RFC's impairment of security interest in collateral claim, given that there is no such claim, and that even if such a claim is recognized, RFC failed to prove damages or causation.
6. The trial court erred in giving a special jury instruction on spoliation despite the absence of any factual basis that evidence was spoliated, and despite the fact that RFC had the allegedly spoliated evidence in hand before trial.
7. The trial court erred in giving the particular jury instruction on spoliation requested by RFC, as it misstated the law of spoliation.
8. To the extent that a spoliation instruction was appropriate, the trial court erred in refusing to give the alternative instruction on spoliation proposed by EarthLink.
9. The trial court erred in denying EarthLink the opportunity to proffer evidence demonstrating that it had not spoliated any evidence.
10. The trial court erred in giving all of RFC's proposed jury instructions verbatim, and giving none of EarthLink's proposed jury instructions.
11. The trial court erred in repeatedly instructing the jury to find in favor of RFC, but never stating the alternative, i.e., that the jury could find in favor of EarthLink.
12. The trial court erred in repeatedly instructing the jury to deem certain facts as having been established, when those facts were disputed.
13. The trial court erred in repeatedly referring to EarthLink in pejorative terms in its jury instructions.
14. The trial court erred in giving RFC proposed jury instruction no. 11, which is not an accurate statement of the law of consent, and which effectively took the issue of consent — EarthLink's principal defense — from the jury.
15. The trial court erred in giving RFC proposed jury instruction no. 17, which is not an accurate statement of the law of security interests, and which effectively took the issue of consent — EarthLink's principal defense — from the jury.
16. The trial court erred in giving RFC proposed jury instruction no. 19, which is not an accurate statement of the law of security interests, and which effectively took the issue of consent — EarthLink's principal defense — from the jury.
17. The trial court erred in giving RFC proposed jury instruction no. 21, which is not an accurate statement of the law of security interests, and which, among other things, invented a new cause of action for "failure to conduct a lien search."
18. The trial court erred in giving RFC proposed jury instruction no. 22, which is not an accurate statement of the law on the release of a security interest in collateral.
19. The trial court erred in giving RFC proposed jury instruction no. 23, as there is no tort in Ohio for "impairment of a security interest."
20. The trial court erred in giving RFC proposed jury instruction no. 24 on conversion, which instruction omitted the element of a demand for return of the collateral, and which added the element of "securing an express release," effectively eliminating the law of implied consent.
21. The trial court erred in giving RFC proposed jury instruction no. 25 on unjust enrichment, which instruction omitted the requirement that RFC be the source of the benefit conferred, and eliminated the injustice element.
22. The trial court erred in giving RFC proposed jury instruction no. 27 on tortious interference with contract, which omitted the intent element.
23. The trial court erred in giving RFC proposed jury instruction no. 28, captioned "Interpretation of a Writing — Prior Written Consent," which instructed the jury to find for RFC on its tortious interference claim if RFC proved one fact — that it did not consent in writing to the transaction — and which eliminated EarthLink's consent defense.
24. The trial court erred in giving RFC proposed jury instruction no. 29, captioned "Interpretation of a Writing — Payments into Controlled Accounts," which instructed the jury to find for RFC on its tortious interference claim if RFC proved one fact — that EarthLink did not transfer its payments to ICC into the RFC "lockbox" that EarthLink didn't even know existed — and which eliminated EarthLink's consent defense.
25. The trial court erred in giving RFC proposed jury instruction no. 30, which is not an accurate statement of the law of consent, and which effectively took the issue of consent from the jury.
26. The trial court erred in giving RFC proposed jury instruction no. 31 on consent, which invented a new, heightened burden of proof, and eliminated the doctrine of implied consent from the law.
27. The trial court erred in giving RFC proposed jury instruction no. 32, which invented a new, heightened burden of proof, eliminated the doctrine of implied consent from the law, and ordered the jury to find for RFC on all of its claims if EarthLink failed to prove its affirmative defense of consent.
28. The trial court erred in giving RFC proposed jury instruction no. 35, which is not an accurate statement of the law of damages.
29. The trial court erred in giving RFC proposed jury instruction no. 36, which is not an accurate statement of the law of damages for conversion.
30. The trial court erred in giving RFC proposed jury instruction no. 37, which is not an accurate statement of the law of damages for unjust enrichment.
31. The trial court erred in giving RFC proposed jury instruction no. 38, which instructed the jury that it could award to RFC, a secured creditor, an amount greater than its outstanding loan balance.
32. The trial court erred in giving RFC proposed jury instruction no. 40, which instructed the jury that it could award to RFC, a secured creditor, an amount greater than its outstanding loan balance.
33. The trial court erred in giving RFC proposed jury instruction no. 39, which directed the jury to apply the collateral source rule in this Uniform Commercial Code case, and which again instructed the jury that it could award to RFC, a secured creditor, an amount greater than its outstanding loan balance.
34. The trial court erred in excluding evidence relating to RFC's recovery of part of its damages from the ICC bankruptcy estate, and evidence of RFC's current loan balance.
35. The trial court erred in admitting evidence of and allowing references to the investigation of EarthLink by the Washington Attorney General, which evidence and references were irrelevant and highly prejudicial.
36. The trial court erred in excluding properly authenticated and identified ICC business records.
37. The trial court erred in denying EarthLink the ability to have Jon Steging of ICC testify on the basis that he was untimely disclosed, when the court simultaneously gave RFC clearance to have late-disclosed fact witnesses testify.
38. The trial court erred in denying EarthLink the right to proffer Mr. Steging's probable testimony.
39. The trial court erred in giving a special jury instruction following opening statements based upon conduct of EarthLink's counsel, which instruction effectively directed the jury to ignore EarthLink's principal defense before the trial even began.
40. The trial court erred in admitting thousands of purported ICC customer complaints for the truth of the matters asserted therein without the testimony of a single complaining ICC customer or even an ICC employee.
41. The trial court's bias in the proceedings below was so complete and pervasive that it denied EarthLink due process.
 {¶ 34} By EarthLink's first through fifth assignments of error, it challenges the trial court's denial of its Civ.R. 50(A) motion for directed verdict. Pursuant to Civ.R. 50(A), "a motion for directed verdict is granted if, after construing the evidence most strongly in favor of the party against whom the motion is directed, `reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party.'" Goodyear Tire Rubber Co. v. Aetna Cas. SuretyCo., 95 Ohio St.3d 512, 2002-Ohio-2842, at ¶ 3, quoting Civ.R. 54(A)(4). Although this analysis requires a court to review and consider the evidence, a motion for directed verdict presents a question of law because a court must examine the sufficiency of the evidence, not weigh the evidence or try the credibility of the witnesses. Wagner v. Roche Lab. (1996), 77 Ohio St.3d 116,119. See, also, Malone v. Courtyard by Marriott L.P. (1996),74 Ohio St.3d 440, 445 ("[T]he court is confronted solely with a question of law: Was there sufficient material evidence presented at trial on this issue to create a factual question for the jury?"). As a motion for directed verdict presents a question of law, an appellate court applies the de novo standard of review.Goodyear Tire Rubber Co., supra, at ¶ 4.
 {¶ 35} By EarthLink's first assignment of error, it argues that it obtained the customer base free and clear of RFC's security interest because RFC released that interest. As EarthLink contends, without a security interest, RFC has no basis on which to assert its claims. Accordingly, the trial court should have granted EarthLink directed verdict on all of RFC's claims if RFC released its security interest.
 {¶ 36} EarthLink's argument that RFC released its security interest is based upon R.C. 1309.315(A)(1) [UCC 9-315(a)(1)], which reads:
A security interest or agricultural lien continues in collateral notwithstanding sale, lease, license, exchange, or other disposition thereof unless the secured party authorized the disposition free of the security interest or agricultural lien.
Accordingly, pursuant to R.C. 1309.315(A)(1), although a debtor may sell or otherwise dispose of collateral, that disposition does not extinguish the secured party's interest in the collateral absent the secured party's consent. 1A Coogan, Hogan, Vagts McDonnell, Secured Transactions Under the Uniform Commercial Code (2004) 7A-62, Section 7A.15[1]. In other words, the buyer of the collateral takes the collateral subject to the secured party's interest unless the secured party authorizes its release. 1 Nimmer, Commercial Asset-Based Financing (2003) 3-41, Section 3:16.
 {¶ 37} EarthLink argues that RFC authorized the release of its security interest in the customer base in four ways: (1) RFC implicitly authorized the release through its actions, (2) RFC explicitly authorized the release by agreeing in the Second Amendment to the sale of the customer base, (3) RFC explicitly authorized the release by agreeing in the Second Amendment to release its security interest upon the condition that ICC complete its contractual obligations, and (4) RFC authorized the release by waiving the condition it placed upon its consent to a release. We will deal with each argument in succession.
 {¶ 38} First, EarthLink contends that RFC implicitly authorized the sale of the customer base free from the security interest. EarthLink asserts that RFC's knowledge of the sale, coupled with its failure to stop the sale, amounts to implicit authorization. We disagree.
 {¶ 39} Because nothing in R.C. 1309.315 limits the definition of "authorization" to express authorization, we conclude that a secured party's actions can impliedly authorize the disposition of collateral free of its security interest. Implied authorization occurs "when, from the circumstances, general language and conduct of the parties, it is found that [the secured party] intended to authorize the sale" free of the security interest. J.I. Case Credit Corp. v. Crites (C.A.10, 1988), 851 F.2d 309, 313, quoting Poteau State Bank v. Denwalt
(Okla. 1979), 597 P.2d 756, 760.[8] See, also, Morgan Cty.Feeders, Inc. v. McCormick (Colo.App. 1992), 836 P.2d 1051, 1054
("Implied authorization is a factual determination based upon the circumstances of the parties, the nature of the collateral, the course of dealing of the parties, and the usage of trade."); 1 Clark, The Law of Secured Transactions Under the Uniform Commercial Code (Ed.Rev. 2004) 3-23, Paragraph 3.02[3][b] ("If the lien is to be released, the transferee should provide some affirmative evidence that this was the parties' intent. This is the position taken by Rev. Article 9. Rev. UCC § 9-315(a).").
 {¶ 40} To constitute implied authorization, a secured party's acts must unequivocally demonstrate an intent to waive its security interest since such a waiver cannot be inferred from doubtful or ambiguous factors. United Natl. Bank of Parkersburgv. Norton Machine Co., Inc. (1991), 81 Ohio App.3d 101, 106, quoting Central Washington Bank v. Mendelson-Zeller, Inc.
(1989), 113 Wash.2d 346, 779 P.2d 697, 701. See, also, FirstInterstate Bank of Arizona, N.A. v. Interfund Corp. (C.A.5, 1991), 924 F.2d 588, 595 ("The acts, words or conduct relied upon to establish intention must be such as to manifest an unequivocal intention to no longer assert the right" to the security interest.). Further, because R.C. 1309.315(A)(1) does not require a secured party to take any action to preserve its security interest, inaction alone may not necessarily lead to a finding of an implied authorization. J.I. Case Credit Corp., supra, at 313, quoting Poteau, supra, at 761. See, also, Lafayette Prod.Credit Assn. v. Wilson Foods Corp. (N.D. Ind. 1987),687 F.Supp. 1267, 1276 ("Mere silence, acquiescence or inactivity is not a waiver or authorization unless there was a duty to speak or act.").
 {¶ 41} Generally, whether a secured party has authorized a disposition of collateral free of a security interest is a question of fact. First Interstate Bank of Arizona, N.A.,
supra, at 595; Neu Cheese Co. v. Federal Deposit Ins. Corp.
(C.A.8, 1987), 825 F.2d 1270, 1272; In re Klipfer
(Bankr.Ct.S.D.Ohio 1986), 62 B.R. 290, 295; Central WashingtonBank, supra, at 700; Northern Commercial Co. v. Cobb (Alaska 1989), 778 P.2d 205, 208. Consequently, in order to prevail, EarthLink must demonstrate that reasonable minds could only conclude that RFC's actions demonstrated an intent to authorize the release of its security interest in the customer base. EarthLink attempts to meet this burden by pointing to evidence that RFC knew of ICC's intent to sell the customer base prior to the execution of the EarthLink Agreement, but it did nothing to stop the sale. Further, EarthLink notes that RFC employees admitted to knowingly accepting sale proceeds from ICC to pay down ICC's loan. In response, RFC points to Mr. Rudek and Mr. Mitchell's testimony that they consistently told ICC employees that RFC would not release its security interest without ICC's compliance with certain conditions. Moreover, RFC stresses that it never filed a UCC-3 form terminating its security interest.
 {¶ 42} Construing the evidence in favor of RFC as the non-moving party, we conclude that there was sufficient evidence to create a question of fact regarding RFC's intent. In other words, reasonable minds could differ as to whether RFC's actions, or its inaction, unequivocally demonstrated an intent to release its security interest. Although RFC knew of the sale and accepted part of the sale proceeds, RFC also repeatedly refused to release its security interest unless ICC met certain conditions. Given this conflicting evidence regarding RFC's intent, directed verdict in EarthLink's favor was unjustified. Accordingly, we conclude that the trial court properly denied EarthLink directed verdict on its consent defense despite EarthLink's contention that RFC implicitly authorized the release of its security interest.
 {¶ 43} Second, EarthLink contends that RFC expressly authorized the release of its security interest when it consented to the sale of the customer base in the Second Amendment. We disagree.
 {¶ 44} Before the recent revision of the Uniform Commercial Code ("UCC"), the analogous provision to current R.C.1309.315[9] read, "a security interest continues in collateral notwithstanding sale, exchange, or other disposition thereof unless the disposition was authorized by the secured party in the security agreement or otherwise * * *." Former R.C.1309.25(B) [Former UCC 9-306(2)]. Courts interpreting this provision debated whether it meant a secured party effectuated a release upon the mere authorization of the sale, or whether a secured party was required to authorize the sale free of thesecurity interest before a release occurred. See, e.g., In reSouthern Properties (Bankr.Ct.E.D.Va. 1984), 44 B.R. 838,842-843.
 {¶ 45} On March 10, 1990, the UCC drafters issued PEB Commentary No. 3 to address this dilemma. Pursuant to this Commentary:
A transferee will acquire the collateral free and clear of a preexisting security interest only if the disposition of the collateral by the debtor was authorized by the secured party free and clear of the secured party's security interest. If the disposition was not authorized by the secured party, or was authorized by the secured party subject to the secured party's security interest, the transferee will not acquire the collateral free and clear of the security interest. Thus, if a secured party authorized the sale of the collateral, but retained a security interest in the collateral, the security interest survived the sale.
 {¶ 46} In reworking former UCC 9-306(2), the UCC drafters adopted the view of Commentary No. 3 by making it explicit in UCC 9-315(a)(1) that a security interest continues in collateral "unless the secured party authorize[s] the disposition free ofthe security interest * * *." UCC 9-315(a)(1) (emphasis added). See, also, UCC 9-315 Official Comment 2. Further, the revised UCC provides that if a secured party opts to authorize the disposition only, then the secured party's filed financing statement remains effective. R.C. 1309.507(A) [UCC 9-507(a)] ("A filed financing statement remains effective with respect to collateral that is sold, exchanged, leased, licensed, or otherwise disposed of and in which a security interest or agricultural lien continues, even if the secured party knows of or consents to the disposition.").
 {¶ 47} In the case at bar, Section 11 of the Second Amendment provided that:
[RFC] hereby consents to the sale of the Purchased Accounts by [ICC]. Upon the performance by [ICC] * * * of all [its] obligations under the Loan Agreement and this Amendment, [RFC] agrees to release its security interest in the Purchased Accounts.
Construing the two sentences of Section 11 together, we conclude that RFC authorized the sale of the customer base, but made that collateral subject to its security interest until ICC performed its contractual obligations. Because RFC retained its security interest, despite its consent to the sale, the customer base remained encumbered as long as ICC's contractual obligations went unperformed. Additionally, pursuant to R.C. 1309.507(A), because RFC only authorized the sale of the customer base, and not the release of its security interest, the UCC-1 financing statement RFC filed with the Colorado Secretary of State and the Denver County Recorder's Office remained effective.
 {¶ 48} Accordingly, we conclude the trial court properly denied EarthLink a directed verdict on EarthLink's consent defense despite EarthLink's contention that RFC authorized the release of its security interest by consenting to the sale of the customer base in the Second Amendment.
 {¶ 49} Third, EarthLink contends that the condition RFC imposed upon the release of its security interest (i.e., ICC's performance of its contractual obligations) was ineffective against EarthLink because satisfaction of the condition was outside of EarthLink's control. Consequently, EarthLink reasons that, even though ICC did not perform its contractual obligations, RFC's security interest was released.
 {¶ 50} As EarthLink points out, there is a split in authority regarding whether a conditional consent cuts off a secured party's interest in the collateral. The line of authority EarthLink relies upon holds that, "a condition imposed on an authorization to sell is ineffective, unless performance of the condition is within the buyer's control." Production CreditAssn. of Baraboo v. Pillsbury Co. (1986), 132 Wis.2d 243,392 N.W.2d 445, 448. See, also, Moffat Cty. State Bank v. ProducersLivestock Marketing Assn. (D.Colo. 1984), 598 F.Supp. 1562,1568-1570, affirmed (C.A.10, 1987), 833 F.2d 908; Peoples Natl.Bank Trust v. Excel Corp. (1985), 236 Kan. 687, 695 P.2d 444,447-450; Anon, Inc. v. Farmers Prod. Credit Assn. of Scottsburg
(Ind.App. 1983), 446 N.E.2d 656, 661-662. These courts reason that a condition requiring performance only the seller can provide is not a "real" condition because it "makes the buyer an insurer of acts beyond its control." First Natl. Bank TrustCo. of Oklahoma City v. Iowa Beef Processors, Inc. (C.A.10, 1980), 626 F.2d 764, 769. Under this view, the third party purchaser who agreed to no condition has superior rights over the secured party who permitted the collateral to be placed on the market. Western Idaho Prod. Credit Assn., L.V. v. Simplot FeedLots, Inc. (1984), 106 Idaho 260, 678 P.2d 52, 56.
 {¶ 51} Not surprisingly, RFC directs us to the contrary line of authority, which holds that regardless of the nature of the condition, "[n]o authorization exists where the debtor fails to satisfy the conditions of the creditor's conditional consent."Northern Commercial Co., supra, at 208-209. See, also,Churchill Business Credit, Inc. v. Pacific Mutual Door Co.
(C.A.8, 1995), 49 F.3d 1334, 1337-1338; United States v. WinterLivestock Comm. (C.A.10, 1991), 924 F.2d 986, 992-993; In reDettwiller (Bankr.Ct.S.D.Ohio 1993), 156 B.R. 540, 544-545
(construing Ohio law); Matteson v. Harper (1984), 297 Or. 113,682 P.2d 766, 768-769; Oxford Prod. Credit Assn. v. Dye (Miss. 1979), 368 So.2d 241, 242; Southwest Washington Prod. CreditAssn. v. Seattle-First Natl. Bank (1979), 92 Wash.2d 30,593 P.2d 167, 169; Western Natl. Bank of Casper v. ABC Drilling Co.,Inc. (1979), 42 Colo.App. 407, 599 P.2d 942, 945; Baker Prod.Credit Assn. v. Long Creek Meat Co., Inc. (1973), 266 Or. 643,513 P.2d 1129, 1134. These courts reason that the UCC does not prevent a secured party from attaching a condition or limitation to its consent. Southwest Washington Prod. Credit Assn., supra, at 169. Further, these courts maintain that a buyer can protect itself by searching UCC filings to ascertain whether a security interest exists and then contacting the secured party to determine whether there are any conditions attached to the consent. Baker Prod. Credit Assn., supra, at 1134.
 {¶ 52} After reviewing the authority on each side of this issue, we are persuaded that any and all conditions a secured party places upon its consent must be satisfied for the consent to be effective. We do not agree with the reasoning of FirstNatl. Bank Trust Co. of Oklahoma City, supra, and its progeny that a conditional consent should be construed as a full authorization of a release because the condition is out of the buyer's control. Rather, we hold that it is the buyer, who has the power to ascertain any potential conditions prior to sale and the status of those conditions, that must bear the consequences of purchasing another's collateral. Northern Commercial Co.,
supra, at 209 ("[T]he purchaser can easily protect itself by checking the records for any security interests in the item, requiring proof of consent, and making payment directly to the creditor.").
 {¶ 53} By giving the secured party the power to authorize the release of the security interest, the UCC places the secured party in a superior position over a third party purchaser. Thus, the onus is on the third party purchaser to determine if a security interest exists and ensure that the secured party fully authorizes the release of that security interest. If the third party purchaser does not conduct a search of UCC filings or does not obtain a release, it must bear the risk and/or burden of buying potentially encumbered collateral.
 {¶ 54} This burden, however, is relatively light. When purchasing goods that are subject to a security interest, the buyer must simply communicate with the secured party disclosed in the UCC filing to determine what conditions, if any, the secured party has placed upon its consent to a release. See WabassoState Bank v. Caldwell Packing Co. (1976), 308 Minn. 349,251 N.W.2d 321, 324 ("a simple phone call would have determined whether the bank had authorized [the] sale"). If a secured party discloses that it will only consent if the seller satisfies a condition (whether it be a condition precedent or subsequent to the release), the buyer can then investigate the likelihood of the condition occurring, value the collateral in the context of the potentially ongoing security interest and generally assess the risk of going forward with the transaction. If the buyer determines that the risk presented by the conditional consent is too high, it can decide not to consummate the deal. While the condition may only be in the seller's power to satisfy, the decision to purchase the collateral is totally within the buyer's power.
 {¶ 55} In the case at bar, RFC agreed to release its security interest in the customer base "[u]pon the performance by [ICC] * * * of all [its] obligations under the Loan Agreement and [the Second] Amendment." This provision reflected RFC's consistentlyheld position that it would only release its security interest if ICC either paid off or paid down the loan. ICC, however, did not satisfy either of these conditions. Therefore, RFC never authorized the release of its security interest in the customer base.
 {¶ 56} EarthLink's ignorance of the condition contained in the Second Amendment until after it transferred ICC's customers to its system and its inability to satisfy the condition itself are not significant factors in our analysis. By not obtaining a full release of RFC's publicly-disclosed security interest, EarthLink assumed the risk that the customer base would remain encumbered by that security interest. Accordingly, we conclude that the trial court properly denied EarthLink a directed verdict on EarthLink's consent defense despite EarthLink's contention that RFC's conditional consent amounted to a full authorization of the release of RFC's security interest.
 {¶ 57} Fourth, EarthLink contends that RFC waived the condition it placed upon its consent to a release by allowing the sale of the customer base and accepting proceeds from the sale to pay down the loan. We disagree.
 {¶ 58} "`A waiver is a voluntary relinquishment of a known right, with the intent to do so with full knowledge of all the facts.'" Newsom v. Newsom (March 21, 2002), Franklin App. No. 01AP-686, quoting North Olmsted v. Eliza Jennings, Inc. (1993),91 Ohio App.3d 173, 180. Here, there is a question of fact regarding whether RFC intended to voluntarily relinquish its security interest. As we discussed above, RFC employees testified that they repeatedly told ICC that RFC would not release its security interest in the customer base unless ICC paid off or paid down the loan. Given this testimony, the trial court properly denied a directed verdict in EarthLink's favor on its consent defense despite EarthLink's contention that RFC waived the condition for release of the security interest.
 {¶ 59} Because we have rejected each of EarthLink's arguments that RFC authorized the release of its security interest in the customer base, we overrule EarthLink's first assignment of error.
 {¶ 60} By its second assignment of error, EarthLink argues that RFC failed to prove sufficient facts to establish its conversion claim. We agree.
 {¶ 61} Conversion "is the wrongful exercise of dominion over property to the exclusion of the rights of the owner, or withholding it from his possession under a claim inconsistent with his rights." Joyce v. General Motors Corp. (1990),49 Ohio St.3d 93, 96. This definition can be broken down into three basic elements: (1) a defendant's exercise of dominion or control (2) over a plaintiff's property (3) in a manner inconsistent with the plaintiff's rights of ownership. Cozmyk Ent., Inc. v. Hoy (June 30, 1997), Franklin App. No. 96AP-1380. If a defendant comes into possession of property lawfully, a plaintiff must prove two additional elements to establish conversion: (1) that it demanded the return of the property after the defendant exercised dominion or control over the property and (2) that the defendant refused to deliver the property to the plaintiff. Tolson v. TriangleReal Estate, Franklin App. No. 03AP-715, 2004-Ohio-2640, at ¶ 17, citing Ohio Tel. Equip. Sales, Inc. v. Hadler Realty Co.
(1985), 24 Ohio App.3d 91, 93. See, also, Kitchen v. Welsh Ohio,LLC (June 12, 2001), Franklin App. No. 00AP-1256. Notably, the demand and refusal elements are conditional, and are only necessary "if the original taking was rightful and no act of dominion or control inconsistent with the plaintiff's ownership had taken place." Ohio Tel. Equip. Sales, Inc., supra, at 94. The object of the demand and refusal elements are to "turn an otherwise lawful possession into an unlawful one, by reason of a refusal to comply * * *." Fidelity Deposit Co. v. Farmers Citizens Bank (1943), 72 Ohio App. 432, 434.
 {¶ 62} Generally, when a debtor sells collateral to a third party purchaser, the secured party may seek recovery from the third party purchaser through a suit for conversion. In theMatter of Keystone Gen., Inc. (Bankr.Ct.S.D.Ohio 1991),135 B.R. 275, 282; John Deere Co. v. Yoder (June 26, 1981), Fulton App. No. F-80-12. However, in some cases, conversion is not an appropriate remedy for a secured party whose collateral is in a third party purchaser's possession. R.C. 1309.315, Official Comment 2 (secured party may maintain an action for conversion only "in an appropriate case"). EarthLink argues this is such a case. EarthLink asserts that because RFC consented to EarthLink's acquisition of the collateral (as distinguished from RFC's conditional consent to the release of its security interest in the collateral), RFC was required to satisfy the conditional elements of demand and refusal to establish conversion. With no evidence of a demand or refusal in the record, EarthLink maintains that the trial court erred in denying its motion for a directed verdict on this claim.
 {¶ 63} A third party purchaser lawfully obtains another's collateral if the debtor has the authority to sell it. SeeUnited States v. Tugwell (C.A.4, 1985), 779 F.2d 5, 7 (taking possession when a debtor was not empowered to sell represents unauthorized dominion); United States v. Equity LivestockAuction Mkt. (E.D.Wis. 1983), 575 F.Supp. 1524, 1527 (selling collateral was wrongful without the written consent to sell the security agreement required); Sanborn Cty. Bank, Inc. v. MagnessLivestock Exchange, Inc. (S.D. 1987), 410 N.W.2d 565, 567
(conversion arises when the debtor does not have the authority to sell). Here, the Loan and Security Agreement between ICC and RFC provided that ICC could not sell the customer base absent RFC's written consent. However, RFC gave that written consent in the Second Amendment. Thus, when EarthLink acquired possession of the first database containing ICC customer information on May 6, 2001, it did so with RFC's permission. Accordingly, EarthLink obtained the customer base lawfully, even though it remained encumbered by RFC's security interest.
 {¶ 64} Consequently, in order for RFC to prove its conversion claim, it had to establish that it demanded the return of the customer base and that EarthLink refused to relinquish it. No such evidence was introduced at trial. Therefore, we conclude that the trial court erred in denying EarthLink a directed verdict on RFC's conversion claim.
 {¶ 65} Accordingly, we sustain EarthLink's second assignment of error. {¶ 66} By EarthLink's third assignment of error, it argues that RFC failed to prove sufficient facts to establish its claim of tortious interference with a contractual relationship. We agree.
 {¶ 67} In order to establish a claim for tortious interference with a contractual relationship, a plaintiff must prove: "(1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) lack of justification, and (5) resulting damages." Kenty v. Transamerica Premium Ins.Co. (1995), 72 Ohio St.3d 415, 419. EarthLink concedes that RFC presented sufficient evidence to establish the first and second elements of this claim. However, EarthLink argues that RFC did not prove that EarthLink intentionally procured the breach of the Loan and Security Agreement, much less that EarthLink caused the supposed breach without justification or that damages resulted.
 {¶ 68} A plaintiff can satisfy the intent element of a claim for tortious interference with a contractual relationship in two ways: (1) by proving that the defendant acted with the purpose or desire to interfere with the performance of the contract or (2) by proving that the defendant knew that interference was certain or substantially certain to occur as a result of its actions. Restatement of Law 2d, Torts (1977), Section 766, Comment j. Here, in order to show that EarthLink intentionally procured the breach of the Loan and Security Agreement, RFC presented evidence that EarthLink knew of RFC's security interest in the customer base, but nevertheless, induced ICC customers to transfer to EarthLink for their internet services. RFC, however, takes this evidence out of context. EarthLink may have intentionally sought ICC's customers, but it did so only because ICC represented in the EarthLink Agreement and its SEC filings that RFC had agreed to release its security interest in the customer base. Because the evidence established that EarthLink believed this misrepresentation and thought that RFC had agreed to waive ICC's contractual obligations with respect to the customer base, EarthLink could not know, much less intend, that its taking of the customer base would interfere with the Loan and Security Agreement.
 {¶ 69} RFC's argument that EarthLink induced ICC to breach other provisions of the Loan and Security Agreement similarly fails. RFC contends that EarthLink intentionally led ICC to breach the provisions of the Loan and Security Agreement that required ICC: (1) to obtain RFC's written consent to sell any collateral and (2) to instruct EarthLink to remit payments for the customer base to RFC's lockbox account. However, it was undisputed that EarthLink never received a copy of the Loan and Security Agreement, and thus, had no knowledge of these provisions. Consequently, EarthLink could not know, much less intend, that its actions would interfere with ICC's obligations under the Loan and Security Agreement.
 {¶ 70} Therefore, as reasonable minds could only conclude that EarthLink did not intentionally procure the breach of the Loan and Security Agreement, we conclude that the trial court erred in denying EarthLink a directed verdict on RFC's claim for tortious interference with a contractual relationship. Accordingly, we sustain EarthLink's third assignment of error.
 {¶ 71} We next address EarthLink's fifth assignment of error. By that assignment of error, EarthLink first argues that Ohio does not recognize a claim for impairment of a security interest in collateral. Second, EarthLink argues that even if RFC's claim for impairment is viable, RFC failed to prove sufficient facts to establish such a claim.
 {¶ 72} Since 1846, Ohio courts have recognized a claim for the impairment of a secured party's security interest in real property. Allison v. McCune (1846), 15 Ohio 726, 731 (where a security interest in real property is "diminished, and damages result from the act, to the plaintiff, the action lies" [emphasis in original]). A secured party can recover under this claim if it proves: (1) the defendant's actions lessened the value of the plaintiff's security interest and (2) resulting damages. City of Toledo v. Brown (1936), 130 Ohio St. 513, 519;Ohio Valley Bank v. Copley (1997), 121 Ohio App.3d 197, 208;Trip Agency, Inc. v. Akkihal (Nov. 4, 1991), Lawrence App. No. 1946.
 {¶ 73} Although the security interest impaired in every Ohio case dealing with this claim was real property, we see no reason why security interests in other types of property cannot also be the subject of an impairment claim. Indeed, other courts have allowed a secured party to assert an impairment claim when the collateral involved was personal property. See PioneerCommercial Funding Corp. v. United Airlines, Inc. (S.D.N.Y. 1991), 122 B.R. 871, 886 (recognizing the claim when the security interest was in accounts receivable); Bank of India v. Weg Myers, P.C. (1999), 257 A.D.2d 183, 691 N.Y.S.2d 439, 445
(recognizing the claim when the security interest was in proceeds from a lawsuit); Rite-Way Refuse Disposal, Inc. v. Vanderploeg
(1987), 161 Mich.App. 274,409 N.W.2d 804,806 (recognizing the claim when the security interest was in a business); Baldwin v.Marina City Prop., Inc. (1978), 79 Cal.App.3d 393,145 Cal.Rptr. 406, 411
(recognizing the claim when the security interest was in a limited partnership interest).
 {¶ 74} EarthLink argues, however, that a claim for impairment is not available to a secured party under the UCC because Comment 2 to UCC 9-315 states that when a security interest survives the disposition of the collateral, "the secured party may repossess the collateral * * * or, in the appropriate case, maintain an action for conversion." EarthLink interprets this language to mean that a secured party whose unreleased collateral is in a third party purchaser's possession can only bring claims for replevin or conversion. We disagree. Comment 2 simply reflects the reality that a secured party seeking the return or the value of its collateral will logically plead claims for replevin or conversion. Although replevin and conversion may be the most logical claims in most circumstances, a secured party may also assert a claim for the impairment of a security interest if the facts support it.
 {¶ 75} Therefore, we conclude that RFC can assert a claim for the impairment of its security interest in the customer base. Consequently, we must now address EarthLink's argument that RFC did not introduce sufficient evidence to prove its impairment claim.
 {¶ 76} EarthLink maintains that in order to prove the impairment of the customer base, RFC had to first establish the number of ICC customers who could have, but did not, transition to EarthLink. Second, EarthLink maintains RFC had to prove that these customers did not transition due to EarthLink's actions. EarthLink asserts that RFC did not present sufficient evidence to prove these facts. We disagree.
 {¶ 77} RFC introduced both documents and testimony demonstrating that thousands of ICC dial-up customers canceled their accounts due to EarthLink's actions. Mr. Neves stated in an email that he estimated 3,200 to 3,500 customers cancelled their accounts because of the confusing, inconsistent communications they received from ICC and EarthLink. EarthLink's own "User Count Summary" shows that thousands of customers cancelled their accounts because they did not want to be acquired by EarthLink or that they were dissatisfied with the transition. Finally, EarthLink itself rejected thousands of ICC customers by deciding not to service their area or by not loading their accounts into its customer and billing database. Therefore, we conclude that RFC presented sufficient evidence to create a question of fact regarding whether EarthLink impaired RFC's security interest, thus precluding a directed verdict in EarthLink's favor on this claim.
 {¶ 78} Accordingly, we overrule EarthLink's fifth assignment of error.
 {¶ 79} By EarthLink's fourth assignment of error, EarthLink argues that RFC cannot prevail on its claim of unjust enrichment under any set of facts. We agree.
 {¶ 80} In order to prove unjust enrichment, a plaintiff must establish a benefit conferred by the plaintiff upon a defendant, the defendant's knowledge of the benefit, and the defendant's retention of the benefit under circumstances where it would be unjust to do so without payment. Hambleton v. R.G. Berry Corp.
(1984), 12 Ohio St.3d 179, 183. However, where damages may be available for breach of contract or in tort, a plaintiff cannot also invoke the equitable remedy for unjust enrichment. Saraf v.Maronda Homes, Inc., Franklin App. No. 02AP-461, 2002-Ohio-6741, at ¶ 12, quoting Banks v. Nationwide Mut. Fire Ins. Co. (Nov. 28, 2000), Franklin App. No. 99AP-1413.
 {¶ 81} As we explained above, RFC can seek recovery pursuant to a claim for impairment of a security interest. Therefore, because damages may be available to RFC in tort, RFC cannot also seek recovery via a claim for unjust enrichment.[10]
Accordingly, EarthLink was entitled to a directed verdict on RFC's unjust enrichment claim, and thus, we sustain EarthLink's fourth assignment of error.
 {¶ 82} By EarthLink's sixth and seventh assignments of error, EarthLink argues that the trial court erred by concluding EarthLink spoliated evidence and by instructing the jury that it should assume the evidence destroyed was favorable to RFC's claims. We agree.
 {¶ 83} On January 16, 2003, one of RFC's attorneys deposed Kenneth Roger Jones, Jr., who was employed by EarthLink as the marketing manager responsible for communications related to integrations at the time of the ICC integration. During his deposition, Mr. Jones testified that EarthLink hired Wessan Interactive ("Wessan") to make automated marketing telephone calls to ICC dial-up customers who had neither activated their accounts with EarthLink nor advised EarthLink that they were opting out of the integration. Mr. Jones also testified that Wessan submitted a report to him consisting of each telephone number called and whether or not the automated message was successfully delivered. RFC's attorney and Mr. Jones then had the following exchange:
Q: Do you maintain these reports from Wessan?
A: I purged my records when I moved to my new position [in early January 2003]. I didn't keep anything related to integrations really.
Q: So would that be fair to say you purged all your documents relating to integrations this month?
A: Yes.
Q: Did anybody at EarthLink contact you before you purged those about any document requests that RFC had served in this case?
A: No.
Q: Nobody from either Mr. Sunderland's office or the legal staff at EarthLink or anybody else contacted you and said we need to get a look at your documents regarding loyalty marketing related to this [ICC] integration?
A: Yes.
Q: When was that?
A: I believe it was sometime last week.
Q: And did you have those documents or were they already purged?
A: I had a few things still laying around.
Q: Do you recall what those few things were?
A: I do not.
* * *
Q: Is there any other source or any other party that would maintain those documents regarding loyalty marketing other than you?
A: No.
* * *
Q: * * * [C]an you recall any of the documents, the type of document that you had, at least?
A: They were communication drafts, they were probably some inactivation reports, things of that nature.
Q: Would there have been possibly reports from Wessan on the outbound phone calls?
A: Possibly.
Q: Would there be any e-mails from anybody on the cross-functional team related to the [ICC] integration?
A: Probably.
 {¶ 84} Based upon Mr. Jones' admission that he destroyed documents, RFC filed a motion for sanctions on May 19, 2003. In this motion, RFC requested that the trial court preclude EarthLink from presenting evidence regarding the size of the ICC dial-up customer base since EarthLink destroyed evidence on that issue. Also, RFC requested that the trial court instruct the jury to assume that the destroyed evidence was favorable to RFC's claims and that EarthLink consciously destroyed this favorable evidence to deny RFC the opportunity to present it to the jury. In response, EarthLink asserted that the only document that Mr. Jones possibly destroyed that was not already disclosed was the Wessan report. In order to rectify the situation, EarthLink obtained the report from Wessan and delivered it to RFC.
 {¶ 85} On June 3, 2003, immediately before the start of the trial, the trial court granted RFC's motion to the extent that it requested an adverse jury instruction. At the conclusion of the trial, the trial court instructed the jury that:
During the pendency of this case plaintiff RFC requested that defendant EarthLink produce certain documents in discovery. Thereafter, you should be aware that EarthLink, with knowledge of RFC's request, allowed its employees to destroy those documents. Some of those documents contained information relating to the size of [ICC's] dial-up customer base converted by EarthLink. Likewise, some of those documents related to communications from former [ICC] dial-up customers with EarthLink regarding the customers' opposition to, and dislike of EarthLink as a result of EarthLink's treatment of those customers during the integration process. Because of EarthLink's intentional destruction of those relevant documents, you should assume that the evidence destroyed by EarthLink was favorable to RFC's claims.
For example, you should assume that the evidence destroyed showed that [ICC's] dial-up customer base was of the size and magnitude presented by RFC during the trial. In addition, you should assume that former [ICC] dial-up customers either refused to convert to EarthLink or converted and then left EarthLink as a result of EarthLink's treatment of them. In reaching your decisions, you should also assume that EarthLink consciously destroyed those documents to deny RFC the opportunity to present that favorable evidence to you.
 {¶ 86} Before the trial court gave this jury instruction, EarthLink attempted to proffer the testimony of Mr. Jones to establish that RFC received a copy of any document Mr. Jones might have destroyed. When the trial court refused to permit EarthLink to make this proffer, EarthLink filed a written proffer after the conclusion of the trial. In that proffer, EarthLink represented that Mr. Jones could not recall any document, other than the Wessan report, over which he was the sole custodian. Further, after reviewing all the documents related to the ICC transaction that Mr. Jones created, that were addressed to him, on which he was copied or for which he might otherwise have obtained a copy, Mr. Jones could not identify any other documents that he would have had in his possession other than the Wessan report. Finally, EarthLink represented that none of the documents Mr. Jones may have had in his possession were relevant to the size of ICC's dial-up customer base, EarthLink's treatment of any ICC customers, any improper action by EarthLink towards ICC's former customers during the course of the integration or the value of RFC's collateral.
 {¶ 87} When a party has violated the discovery rules, a trial court has broad discretion to craft the appropriate sanction.Nakoff v. Fairview Gen. Hosp. (1996), 75 Ohio St.3d 254, syllabus. An appellate court should only reverse such rulings for abuse of discretion. Id.
 {¶ 88} Even before Ohio's adoption of the Civil Rules of Procedure, trial courts sanctioned the spoliation of evidence by giving an adverse jury instruction. See Banks v. Canton HardwareCo. (1952), 156 Ohio St. 453. See, also, Cherovsky v. St.Luke's Hosp. of Cleveland (Dec. 14, 1995), Cuyahoga App. No. 68326 (discussing both pre- and post-Ohio Civil Rules of Procedure case law). Out of these cases arose the rule applied today that, generally, an adverse instruction is appropriate when a party who had control of the evidence failed, without satisfactory explanation, to disclose that evidence. Schwaller v. Maguire,
Hamilton App. No. C-020555, 2003-Ohio-6917, at ¶ 24; Brokamp v.Mercy Hosp. Anderson (1999), 132 Ohio App.3d 850, 870;Vernardakis v. Thriftway, Inc. (May 7, 1997), Hamilton App. No. C-960713; Signs v. Ohio Dept. of Rehab. Corr. (Nov. 22, 1994), Franklin App. No. 94API05-628. However, before a trial court will consider such an instruction, the party seeking the instruction must make "a strong showing of malfeasance — or at least gross neglect * * *." Schwaller, supra, at ¶ 24; Brokamp, supra, at 870; Vernardakis, supra.
 {¶ 89} Further, in order to sanction a party with an adverse instruction, the trial court must determine that the spoliation of the evidence was prejudicial to the party seeking the instruction. Barker v. Wal-Mart Stores, Inc. (Dec. 31, 2001), Franklin App. No. 01AP-658. Once the party seeking the instruction demonstrates the other's malfeasance, that party enjoys a presumption that it was prejudiced by the spoliation.Bright v. Ford Motor Co. (1990), 63 Ohio App.3d 256, 260. See, also, Cincinnati Ins. Co. v. General Motors Corp. (Oct. 28, 1994), Ottawa App. No. 94OT017; Travelers Ins. Co. v. KnightElec. Co. (Dec. 21, 1992), Stark App. No. CA-8979. The spoliating party then has the burden of rebutting this presumption by demonstrating that its actions did not deprive the other party of favorable evidence not otherwise obtainable. Id.
 {¶ 90} In the case at bar, Mr. Jones destroyed all documents relating to integrations, including the ICC integration, when he was promoted. Although Mr. Jones may not have intended to hamper RFC's case when he purged his files, at the time he destroyed the documents, RFC's claims had been pending for almost eight months. Moreover, about seven months before Mr. Jones purged his files, RFC served discovery requests on EarthLink seeking, among other items, documents related to EarthLink's communications with ICC customers. Despite the pending lawsuit and discovery request, EarthLink offers no explanation why it did not attempt to collect Mr. Jones' ICC integration documents prior to January 2003. Therefore, it was not an abuse of discretion for the trial court to have concluded that EarthLink's failure to preserve Mr. Jones' ICC integration documents amounted to malfeasance or gross neglect.
 {¶ 91} Once RFC established malfeasance or gross neglect, the trial court had to presume that RFC was prejudiced, unless EarthLink could demonstrate that the destruction of the ICC integration documents did not deprive RFC of favorable evidence not otherwise obtainable. To rebut this presumption of prejudice, EarthLink proffered the testimony of Mr. Jones that the only document that he may have possessed that RFC had not already received through discovery was the Wessan report. Thus, the Wessan report was the only potentially favorable evidence RFC did not receive. However, because EarthLink delivered to RFC a copy of the Wessan report, RFC was not deprived of this evidence.
 {¶ 92} RFC, however, asserts that Mr. Jones destroyed more documents than just the Wessan report, and that it was prejudiced because these other documents would have shown: (1) the size of the customer base and (2) EarthLink's treatment of and improper actions towards ICC customers. EarthLink, however, rebuts the presumption that RFC was prejudiced by the destruction of these "other documents" with Mr. Jones' proffered testimony that he never possessed any documents relevant to the size of the customer base or EarthLink's treatment of or improper actions towards ICC customers. Consequently, Mr. Jones' purge of his integration documents did not deprive RFC of favorable evidence relevant those issues. Therefore, we conclude that EarthLink rebutted the presumption of prejudice, and thus, the trial court abused its discretion in giving a spoliation instruction to the jury.
 {¶ 93} Further, even if some kind of spoliation instruction was warranted, we conclude that it was error to instruct the jury to make the specific presumptions included in the instant instruction. Here, the jury was told to assume that the ICC customer base "was of the size and magnitude presented by RFC during the trial" and that the former ICC customers "either refused to convert to EarthLink or converted and then left EarthLink as a result of EarthLink's treatment of them." As we stated above, Earthlink proffered evidence indicating that none of the documents Mr. Jones destroyed were relevant to those two issues. Thus, it was an abuse of discretion to instruct the jury to presume those facts in RFC's favor.
 {¶ 94} Accordingly, we sustain EarthLink's sixth and seventh assignments of error, but only for the reasons given above.
 {¶ 95} Our resolution of EarthLink's first through seventh assignments of error render the remaining assignments of error moot. We have concluded that of the five claims that were submitted to the jury, only RFC's claim for impairment of a security interest should have survived EarthLink's motion for directed verdict. As we stated above, the resolution of the impairment claim turns upon whether EarthLink's actions decreased the value of ICC's customer base. In the spoliation instruction, the jury was told to presume that EarthLink's actions caused ICC customers to refuse to convert to EarthLink or to leave EarthLink, thus diminishing the customer base. Further, the jury was instructed to presume the size of the customer base — central to the calculation of damages — was as RFC claimed.
 {¶ 96} Because the jury was instructed to presume these facts, it necessarily had to find for RFC on its impairment claim and award the damages RFC requested. Now, by concluding that the trial court should not have given this spoliation instruction, we have negated the presumptions supporting the jury's finding of liability and calculation of damages for the impairment claim. Accordingly, we conclude that a reversal of the trial court's June 23, 2003 judgment is warranted and that a new trial is necessary on RFC's claim for impairment of its security interest.
 {¶ 97} Finally, we must address RFC's motions to strike the CD-ROM that EarthLink filed containing an electronic and interactive version of EarthLink's brief and reply brief, along with the cited exhibits, trial court filings, transcript pages and unreported cases. RFC asserts that this court should strike the CD-ROM version of EarthLink's briefs because such briefs are not contemplated by the appellate rules, and in any event, it was filed after the dates on which EarthLink's briefs were due. We disagree.
 {¶ 98} If EarthLink had only filed a CD-ROM version of its briefs, RFC may have prevailed on its motions. However, EarthLink timely filed and served a paper version of its brief and reply brief pursuant to App.R. 18 and 19 and Loc.R. 7. Further, our review of the CD-ROM version of EarthLink's briefs reveals that it contains exact copies of EarthLink's paper briefs, albeit with interactive links. Contrary to RFC's argument, easier access to supporting exhibits does not effect our analysis of the merits of this case. The CD-ROM version of EarthLink's briefs does not give EarthLink an advantage over RFC. Accordingly, we deny RFC's motions to strike the CD-ROM version of EarthLink's briefs.
 {¶ 99} For the foregoing reasons, we overrule EarthLink's first and fifth assignments of error and sustain EarthLink's second, third, fourth, sixth and seventh assignments of error. Further, we overrule the remainder of EarthLink's assignments of error as moot. We reverse the judgment of the Franklin County Court of Common Pleas denying EarthLink directed verdict in part, and affirm it in part. Moreover, we reverse the judgment of the Franklin County Court of Common Pleas granting verdict in favor of RFC and remand this cause to that court for further proceedings in accordance with law and this opinion.
Judgment on directed verdict reversed in part, sustained inpart; judgment granting verdict reversed and case remanded; andmotions to strike briefs denied.
Bowman and Petree, JJ., concur.
[1] When the parties executed the Loan and Security Agreement, ICC was named RMI.Net, Inc. In November 2000, RMI.Net, Inc. became ICC as part of a merger with another internet service provider. On January 12, 2001, RFC and ICC executed the First Amendment to the Loan and Security Agreement to address ICC's name change.
[2] On January 22, 2001, RFC filed a UCC-3 Statement of Change with the Colorado Secretary of State to reflect ICC's name change. In this amendment, RFC did not release its security interest in any of the collateral described in the UCC-1 filing.
[3] EarthLink is an internet service provider whose services include dial-up internet access.
[4] EarthLink remitted a payment of $4,607,500 to ICC on March 15, 2001 — the same day the parties executed the EarthLink Agreement.
[5] The Loan and Security Agreement had set the collection multiple at 3, not 1.75.
[6] Given EarthLink's problems with ICC's data, EarthLink believed that not all of the 85,000 customers loaded into its system were legitimate.
[7] The first and second payments EarthLink made totaled $7.6 million, which amounted to payment for 40,000 customers ($190 bounty x 40,000 customers = $7,600,000).
[8] These cases and the others we cite in this section construe former UCC 9-306(2), the predecessor to current UCC 9-315(a)(1). However, unless otherwise noted, we find former UCC 9-306(2) and current UCC 9-315(a)(1) sufficiently similar so that case law construing former UCC 9-306(2) is applicable to our analysis under R.C. 1309.315(A)(1) [UCC 9-315(a)(1)].
[9] The Ohio General Assembly adopted R.C. 1309.315, which is identical to UCC 9 — 315, effective July 1, 2001.
[10] For this same reason, RFC cannot recover on its claim for an accounting. McNulty v. PLS Acquisition Corp., Cuyahoga App. No. 79025, 2002-Ohio-7220, at ¶ 80 ("Ohio law has consistently held that where there is an adequate remedy at law, an equitable remedy is improper. * * * An accounting is an equitable remedy.").