[Cite as *Whitt Sturtevant, L.L.P. v. NC Plaza L.L.C.*, 2015-Ohio-3976.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

Whitt Sturtevant, LLP,                               :

       Plaintiff-Appellee/                       :
       Cross-Appellant,

                                :          No. 14AP-919

v.                                                         (C.P.C. No. 12CV-015282)

NC Plaza LLC et al.,                                 :         (REGULAR CALENDAR)

       Defendants-Appellants/                    :
       Cross-Appellees.                          :

---

D E C I S I O N

Rendered on September 29, 2015

---

*Lape Mansfield Nakasian & Gibson, LLC*, and *Douglas M. Mansfield*, for appellee/cross-appellant.

*Roetzel & Andress, LPA, Stephen D. Jones, Michael R. Traven*, and *Jeremy S. Young*, for appellants\cross-appellees.

---

APPEAL from the Franklin County Court of Common Pleas

SADLER, J.

{¶ 1} Defendants-appellants, NC Plaza LLC ("NC Plaza") and Arthur Goldner & Associates, appeal from a judgment of the Franklin County Court of Common Pleas in favor of plaintiff-appellee, Whitt Sturtevant, LLP ("Whitt Sturtevant"). For the reasons that follow, we affirm in part and reverse in part.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} In January 2012, attorneys Mark Whitt and Albert Sturtevant began looking for office space in Columbus, Ohio for their newly formed law firm, Whitt Sturtevant.

Whitt was the managing partner for Whitt Sturtevant in Columbus, Ohio.[1]  Whitt engaged the services of a real estate broker by the name of Melissa Ramsier to help Whitt Sturtevant find space in Columbus and negotiate terms.  Whitt and Ramsier entered into negotiations with Mathew Gregory of NAI Ohio Equities, the broker who had the exclusive listing agreement with NC Plaza.

{¶ 3}  As a result of the negotiations, Whitt Sturtevant and NC Plaza executed an occupancy agreement whereby Whitt Sturtevant commenced occupancy of suite 2110 in the NC Plaza building on a temporary basis beginning January 26, 2012.  Whitt Sturtevant was to continue to occupy suite 2110, rent free, until such time as the renovations on suite 2020 could be completed.  The occupancy agreement provides, in relevant part, as follows:

> Landlord shall permit Tenant to occupy <u>155 E. Broad Street, Suite 2110</u> (the "Temporary Premises") as of <u>Monday, January 30, 2012</u>.  Tenant shall be permitted to occupy the Temporary Premises at no charge during lease negotiations and until substantial completion of the Tenant Improvements to the Premises.

(Emphasis sic.)  (Occupancy Agreement, 1.)

{¶ 4}  The parties continued to negotiate terms of a lease agreement through the end of February 2012.  Whitt ultimately signed the written lease agreement on behalf of Whitt Sturtevant on March 14, 2012.  Arthur Goldner, president of Arthur Goldner & Associates, signed the lease on behalf of the owner, NC Plaza, on March 16, 2012.  The lease term was five years and three months commencing on the date of substantial completion in suite 2020, which the parties estimated at 90 days after lease execution.  Under the lease terms, the first three months rent were free.[2]

---

[1] Sturtevant was to run the Whitt Sturtevant office in Chicago, Illinois.

[2] Section 2 of the lease states:

> (a) <u>Term</u>.  Subject to and upon the terms and conditions set forth below, the initial term of this Lease shall be for a period of Five (5) Lease Years and Three (3) Months (as hereinafter defined) (the "Term").  The Term shall commence on the Commencement Date (as hereinafter defined) and end on last day of the last month of the Term.
> (b) <u>Definitions</u>.  For purposes of this Lease, the following terms shall have the following meanings:
> (i) "Commencement Date" shall mean the date that is the day after substantial completion of Landlord's Work.  Landlord shall deliver

{¶ 5}   The lease contains a "temporary occupancy" provision for suite 2110 that is nearly identical to the analogous provision in the occupancy agreement.  The lease also contains the following relevant provisions:

> 4. <u>Construction</u>.
>
> (a) <u>Improvements to be Constructed</u>.  Landlord   shall perform such work and make such installations in the Premises, if any, as are designated as Landlord's Work in Exhibit D, attached hereto and incorporated herein by reference.   Except as expressly set forth in Exhibit D, Landlord has made no promise to alter, remodel or improve the Premises, the Building or the Property, and Tenant agrees to accept the Premises in its "as-is" condition.

(Lease Agreement, 4.)

{¶ 6}   Exhibit D to the lease agreement entitled "Landlord's Work" reads, in relevant part, as follows:

> Landlord, at Landlord's sole cost and expense, not to exceed Landlord's Contribution as hereinafter defined at Paragraph (e) below, shall perform such work and make such installations in the Premises ("Landlord's Work" or the "Work") as are designated in the Plans and Specifications attached hereto and incorporated herein by reference.  Work requested by Tenant in excess of Landlord's Contribution shall be at Tenant's sole cost and expense.  Except as expressly set forth herein, Landlord has made no promise to alter, remodel, clean, decorate, repair, or improve the Premises. Landlord shall proceed with reasonable diligence to cause the Work to be substantially completed, subject to "Tenant Delay"

---

> possession of the Premises to the Tenant on the Commencement Date. Landlord and Tenant anticipate that the Commencement Date will occur on or around ninety (90) days after Lease execution (provided Tenant has approved all Plans and Specifications for Landlord's Work, but subject to Tenant Delay and Force Majeure), and further provided Landlord shall have no liability to Tenant if the Commencement Date occurs after such date. Promptly upon determination of the Commencement Date, Landlord and Tenant shall execute a memorandum, setting forth the Commencement Date and the expiration date of this Lease, in form and substance substantially similar to that attached hereto as Exhibit C and incorporated by reference.
> (ii) The "Rent Commencement Date" shall be ninety (90) days after the Commencement Date.

(Lease Agreement, 1.)

and "Force Majeure Delay" (as such terms are described in Paragraphs (c) and (d) below).

(a) Landlord shall require its contractors and agents to perform Landlord's Work in a good and workmanlike manner. When Landlord considers the Work to be substantially complete or about to be substantially completed, Landlord shall notify Tenant as to the date or anticipated date of substantial completion and of a reasonable time and date for inspection of the Work.[3]

{¶ 7} The parties expressly agreed at paragraph (e) that the landlord's contribution to construction costs would be $49,750. Attached as an exhibit to the lease is a one-page floor plan for suite 2020. Rick Aronhalt, Goldner's building manager, solicited bids from several contractors for the renovation work. Whitt testified on cross-examination that the bids were predicated on the one-page floor plan for suite 2020 that was attached to NC Plaza's proposal for a lease agreement. In the margins of the floor plan is a list of the items to be completed as part of the project. Roslovic Construction was the low bidder with a bid of $40,800. NC Plaza subsequently hired Frank Weaver of WSA Studio ("WSA") to draft plans and specifications for the renovation project. Whitt Sturtevant was not a party to the agreement between NC Plaza and WSA.

{¶ 8} With the input of Whitt, Holly Potter, Whitt Sturtevant's office manager, and an interior decorator hired by Whitt Sturtevant, WSA drafted plans and specifications for the renovation project. On or about April 27, 2012, WSA completed the plans and specifications, and they were submitted to the city of Columbus for approval and permitting. On May 22, 2012, Roslovic provided Aronhalt with revised pricing for the project of $63,700. Whitt testified that Aronhalt did not inform him of this new pricing information. On May 22, 2012, Roslovic entered into a contract with NC Plaza for the renovations. Whitt Sturtevant was not a party to this agreement.

{¶ 9} Construction in suite 2020 began on June 12, 2012. On July 23, 2012, Aronhalt sent a letter to Whitt accusing Whitt Sturtevant of making significant changes to the approved plans "without [his] knowledge" which have caused "significant delays in the delivery of your permanent space." (Plaintiff's exhibit No. 20.) The letter demanded that

---

[3] Exhibit E to the lease agreement specifies "Tenant's Work" as "None."

Whitt Sturtevant commence paying monthly rent beginning August 1, 2012. On July 25, 2012, Whitt responded by denying that Whitt Sturtevant was responsible for delays in the project and asserting that Whitt Sturtevant was not yet obligated to pay rent.

{¶ 10} On July 26, 2012, Whitt, Potter, Aronhalt, and Roslovic met to discuss the progress of the renovation project. The parties also discussed a commencement date at the meeting notwithstanding the lack of progress on the renovations. According to Whitt, he expressed willingness on the part of Whitt Sturtevant to compromise on the 90-day rent-free period once substantial completion was achieved, but he was not willing to agree to a commencement date at that time given the lack of progress on the renovations.

{¶ 11} In August 2012, Gregory contacted Goldner with his concerns that the project was not moving forward. At trial, Gregory acknowledged that he believed Aronhalt was sitting around waiting for Whitt Sturtevant to proceed with the project. Gregory also acknowledged that he asked Goldner to "give [Aronhalt] a little nudge to make sure he's taking control of the project." (Tr. 867.)

{¶ 12} On or about August 6, 2012, Whitt received Roslovic's "proposal" for a change order which had been forwarded to him by Aronhalt. According to Whitt, this was the first time since he signed the lease that he had received any pricing information from Aronhalt. Roslovic's proposed invoice for the project totaled $127,859, more than double the landlord's allowance of $49,750. Whitt responded by informing Aronhalt that Roslovic's proposal included charges for such things as granite countertops and architectural wall panels that Whitt Sturtevant had already purchased for incorporation into the project. Whitt also expressed concerns that the invoice from Roslovic contained little in the way of detail. For example, a line item on the invoice of $64,109 is identified only as "Total Cost of Change." (Defendant's exhibit No. 20-12.) Whitt also suspected that Whitt Sturtevant was being charged for work in the lobby which was not Whitt Sturtevant's responsibility under the lease agreement, as well as other work that should have been included in the cost of the original estimate.

{¶ 13} Roslovic provided Aronhalt with a revised proposal of $96,316 on or about August 24, 2012. When Aronhalt forwarded this pricing information to Whitt Sturtevant, Whitt remained unsatisfied with the lack of detail in the proposal. He was unable to determine from the information in the proposal whether Whitt Sturtevant was being

asked to pay for items that were either included in the cost of the original plans and specifications and were to be paid for by the landlord or were costs resulting from errors and/or omissions of the architect and the contractor. Whitt testified that Whitt Sturtevant was willing to pay for only those additional costs that were attributable to extra work requested by Whitt Sturtevant.

{¶ 14} On or about September 24, 2012, Aronhalt delivered an "Invoice" to Whitt Sturtevant representing the anticipated cost of the renovation project, including changes to the work allegedly requested by Whitt Sturtevant at the July 26, 2012 meeting. The invoice, dated September 20, 2012, specifies a total project cost of $114,547. A line item identified as "Tenant Requested Redesign" indicates a charge of $32,566. (Defendants' exhibit No. 19-00, Plaintiff's exhibit No. 35.) Deducting the landlord's construction allowance of $49,750, the invoice demands immediate payment of $64,797.

{¶ 15} On or about September 25, 2012, Aronhalt notified Whitt Sturtevant that they were to begin paying monthly rent on December 1, 2012, based on a commencement date of September 1, 2012. Aronhalt provided Whitt with a "Commencement Date Agreement" allegedly signed by Whitt that specified an agreed commencement date of September 1, 2012. (Plaintiff's exhibit No. 37.) The document states that the parties reached an agreement regarding the commencement date on July 19, 2012.[4] Whitt testified that he never agreed to a commencement date and that the commencement date agreement provided to him by Aronhalt was either not signed by him or was a blank form he signed at lease execution that Aronhalt later completed without his approval or consent. At trial, Aronhalt admitted that he inserted a commencement date in the designated blank space in the document that Whitt had previously signed, but he insisted that Whitt agreed to a commencement date at the July 26, 2012 meeting.

{¶ 16} Whitt Sturtevant did not pay the invoice, and shortly thereafter, Aronhalt ordered Roslovic to cease work on the project. On the morning of Friday, November 9, 2012, Aronhalt instructed building security to post a "Notice to Leave the Premises" on the door to suites 2020 and 2110. (Plaintiff's exhibit No. 39.) The notice requires Whitt

---

[4] At trial, Aronhalt testified that the agreement was reached at the July 26, 2012 meeting but that he had mistakenly filled in July 19, 2012 as the date the parties agreed to a commencement date.

Sturtevant to "surrender possession" of suite 2020 and 2110 "on or before Monday Nov. 12 2012 by 5:00 p.m." The "Grounds" for eviction listed on the notice include "Failure to pay rent-lease amounts due, failure to timely complete build out in suite 2020, failure to honor additional lease terms, additional failures and deliberate intentional violations of lease." On the morning of Tuesday, November 13, 2012, Whitt Sturtevant's employees arrived at the office to find that the locks had been changed on suite 2110.[5] Aronhalt permitted Whitt Sturtevant employees to enter suite 2110 later that day in order to retrieve client files and personal computers, but they were not permitted to take any other property from suite 2110.

{¶ 17} On December 12, 2012, Whitt Sturtevant brought suit against NC Plaza and Goldner alleging claims of wrongful eviction based on a breach of contract, conversion, business defamation, and rescission of the lease. Appellants filed an answer and counterclaim alleging breach of contract, promissory estoppel, quasi-contract, unjust enrichment, and fraud in the inducement.[6] The case was tried to the court on July 21-24, 2014. The trial court issued a written decision on September 8, 2014. The trial court found in favor of Whitt Sturtevant as to each of the claims for relief set out in the complaint, with the exception of rescission. The trial court also found in favor of Whitt Sturtevant on appellants' counterclaim. The trial court awarded damages to Whitt Sturtevant as follows: $63,509.57 in compensatory damages for claims of breach of contract/wrongful eviction and conversion, $100,000 in compensatory for defamation per se, and $25,000 in punitive damages.

{¶ 18} On September 23, 2014, the trial court held an evidentiary hearing on Whitt Sturtevant's motion for attorney fees. As a result of the hearing, the trial court awarded Whitt Sturtevant $168,519.78 in attorney fees, for a total judgment in the amount of $357,029.35. The trial court entered final judgment on October 9, 2014.

{¶ 19} On November 6, 2014, NC Plaza and Goldner filed a timely notice of appeal to this court from the judgment of the trial court.[7] On November 11, 2014, appellee filed a

---

[5] November 12, 2012 was a legal holiday.
[6] Appellants asserted a cross-claim against Mark Whitt and Albert Sturtevant in their individual capacities seeking to pierce the corporate veil.
[7] No appeal has been taken from the trial court's judgment in favor of Mark Whitt and Albert Sturtevant on the cross-claim.

notice of cross-appeal, "conditioned upon the granting of relief to the Defendants." (Notice of Cross Appeal, 1.) Appellee, however, has not filed a proposed cross-assignment of error or otherwise pursued a cross-appeal herein. Accordingly, under the circumstances, the cross-appeal is moot.

## II. ASSIGNMENTS OF ERROR

{¶ 20} Appellants have assigned the following as error:

1. The trial court erred by entering judgment against Goldner.

2. The trial court erred in finding that NC breached the lease.

3. The trial court erred in finding NC liable for wrongful eviction.

4. The trial court erred in finding NC liable for conversion.

5. The trial court erred in finding NC liable for defamation *per se*.

6. The trial court's award of $100,000 in damages for defamation was an abuse of discretion.

7. Even assuming this court determines that appellants breached the lease, the trial court erred by awarding $39,564.46 in compensatory damages.

8. The trial court erred by awarding WS punitive damages.

9. The trial court erred by awarding WS its attorney's fees.

10. The trial court committed reversible error by dismissing NC's breach of contract counterclaim.

## III. STANDARD OF REVIEW

{¶ 21} Appellants' assignments of error challenge both the trial court's liability determination and its damage award. As a general rule, a court of appeals reviewing a trial court's judgment will give considerable deference to a trial court's findings of fact and conclusions of law. *See Realty Income Corp. v. Garb-Ko, Inc.*, 10th Dist. No. 13AP-35, 2013-Ohio-4932, ¶ 19, citing *EAC Properties, L.L.C. v. Brightwell*, 10th Dist. No. 10AP-853, 2011-Ohio-2373, ¶ 23, citing *Wiltberger v. Davis*, 110 Ohio App.3d 46, 52 (10th

Dist.1996). Deference is extended to the trial court's determination because "the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). Accordingly, "[j]udgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279 (1978), syllabus. *See also State ex rel. Ohio Atty. Gen. v. Shelly Holding Co.*, 191 Ohio App.3d 421, 2010-Ohio-6526 (10th Dist.). An appellate court's review of questions of law is under the de novo standard. *Taylor Bldg. Corp. of Am. v. Benfield*, 117 Ohio St.3d 352, 2008-Ohio-938, ¶ 34.

{¶ 22} With regard to compensatory damages, both the existence and amount of compensatory damages must be shown to a reasonable degree of certainty, and damages that are merely speculative will not give rise to recovery. *Beever v. Cincinnati Life Ins. Co.*, 10th Dist. No. 02AP-543, 2003-Ohio-2942, ¶ 55, citing *Moton v. Carroll*, 10th Dist. No. 01AP-772 (Feb. 12, 2002). As long as there is competent, credible evidence to support the award of compensatory damages, the decision of the trier of fact may not be overturned on appeal. *Shaw v. Thomas*, 10th Dist. No. 99AP-1291 (Nov. 2, 2000), citing *C.E. Morris Co.* at syllabus. "The same standard of review is employed to assess the weight of the evidence whether the finding is for compensatory damages or the elements necessary to justify an award of punitive damages." *Hofner v. Davis*, 111 Ohio App.3d 255, 259 (6th Dist.1996).

## IV. LEGAL ANALYSIS

{¶ 23} For purposes of clarity, we will discuss the assignments of error out of order. Additionally, inasmuch as appellants' second and third assignments concern the trial court's findings and conclusions regarding Whitt Sturtevant's claim for breach of contract/wrongful eviction, we will consider them together.

### A. Appellants' Second and Third Assignments of Error

{¶ 24} In appellants' second assignment of error, appellants contend that the trial court erred when it found that NC Plaza breached the lease agreement. In appellants'

third assignment of error, appellants argue that the trial court erred when it concluded that NC Plaza wrongfully evicted Whitt Sturtevant.

### 1. The Lease Agreement

{¶ 25} "Under Ohio law, 'leases are contracts and, as such, are subject to traditional rules governing contract interpretation.' " *Plaza Dev. Co. v. W. Cooper Ents., L.L.C.*, 10th Dist. No. 13AP-234, 2014-Ohio-2418, ¶ 25, quoting *Heritage Court L.L.C. v. Merritt*, 187 Ohio App.3d 117, 2010-Ohio-1711, ¶ 14 (3d Dist.). "[T]he intent of the parties to a contract resides in the language they chose to employ in the agreement." *Shifrin v. Forest City Ents., Inc.*, 64 Ohio St.3d 635, 638 (1992), citing *Kelly v. Med. Life Ins. Co.*, 31 Ohio St.3d 130 (1987), paragraph one of the syllabus. " 'Common words appearing in a written instrument will be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument.' " *EAC Properties* at ¶ 13, quoting *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241 (1978), paragraph two of the syllabus (superseded by statute on other grounds).

{¶ 26} Goldner participated in the negotiations that led to the execution of the written lease agreement in March 2012. He testified that under the terms of the lease agreement, Whitt Sturtevant assumed the obligation to complete the renovations. He believed that the lease obligated Whitt Sturtevant to seek bids from contractors, enter into a contract with the winning bidder, hire an architect to draft plans and specifications for the renovation project, and manage the construction project through to completion. According to Goldner, NC Plaza's roll in the renovation project was limited to its contribution of a $49,750 construction allowance. The trial court disagreed with Goldner's interpretation of the lease agreement, finding as follows:

> Despite Arthur Goldner's insistence that Whitt Sturtevant was responsible for engaging a contractor and completing the renovation-construction of the permanent space, the terms of the contract are clear and unambiguous. The responsibility for the renovation-construction project was that of the defendants.

(Sept. 8, 2014 Decision, 14.)

{¶ 27} The plain language of the lease and the relevant exhibits thereto supports the trial court's determination that NC Plaza was contractually obligated to proceed with the build out of the permanent space which means that NC Plaza is to contract with the winning bidder, hire an architect to draft plans and specifications, and manage the renovation project. The trial court's interpretation of the lease agreement is consistent with the plain language of "Exhibit D" thereto.

{¶ 28} As NC Plaza's agent, Goldner was tasked with soliciting bids for the project from builders and managing the renovation project. As Goldner's building manager, Aronhalt assumed management responsibilities for the renovation project. Aronhalt's trial testimony suggests that he was qualified to manage a construction project such as the one undertaken in this case. He testified that he had been working as a property and construction manager since 1994.

### 2. Breach of Contract

{¶ 29} " '[B]reach,' as applied to contracts is defined as a failure without legal excuse to perform any promise which forms a whole or part of a contract, including the refusal of a party to recognize the existence of the contract or the doing of something inconsistent with its existence." *Hanna v. Groom*, 10th Dist. No. 07AP-502, 2008-Ohio-765, ¶ 14, quoting *Natl. City Bank of Cleveland v. Erskine & Sons*, 158 Ohio St. 450 (1953), paragraph one of the syllabus. As a general rule, a party does not breach a contract when that party substantially performs the terms of the contract. *Ohio Farmers Ins. Co. v. Cochran*, 104 Ohio St. 427 (1922), paragraph two of the syllabus. Nominal, trifling, or technical departures from the terms of a contract are not sufficient to breach it. *Cleveland Neighborhood Health Serv., Inc. v. St. Clair Builders, Inc.*, 64 Ohio App.3d 639 (8th Dist.1989).

{¶ 30} A material breach is a breach essential to the purpose of the contract. *Software Clearing House, Inc. v. Intrak, Inc.*, 66 Ohio App.3d 163, 170 (1st Dist.1990). The determination of whether a party's breach of a contract was a "material breach" is generally a question of fact. *O'Brien v. Ohio State Univ.*, 10th Dist. No. 06AP-946, 2007-Ohio-4833, ¶ 11, citing *Kersh v. Montgomery Dev. Ctr.*, 35 Ohio App.3d 61, 63 (10th Dist.1987). " '[T]o prove a breach of contract, a plaintiff must establish the existence and terms of a contract, the plaintiff's performance of the contract, the defendant's breach of

the contract, and damage or loss to the plaintiff.' " *Hanna* at ¶ 14, quoting *Samadder v. DMF of Ohio, Inc.*, 154 Ohio App.3d 770, 2003-Ohio-5340, ¶ 27 (10th Dist.), citing *Powell v. Grant Med. Ctr.*, 148 Ohio App.3d 1, 2002-Ohio-443, ¶ 27 (10th Dist.).

{¶ 31} The trial court found that NC Plaza materially breached the lease agreement by failing to competently manage the renovation project and account for project costs and by evicting Whitt Sturtevant from the leased premises without reasonable justification and proper notice.

{¶ 32} NC Plaza roots its defense to the breach of contract/wrongful eviction claim on its assertion that Whitt Sturtevant caused significant delays to the renovation project in suite 2020 that prevented the project from reaching substantial completion within the time contemplated by the parties' agreement.[8]  Although the provisions of the lease agreement pertaining to "Tenant Delay" provide a legal justification for such an argument, the evidence does not support appellants' claim that Whitt Sturtevant delayed the project in a meaningful way.

### 3. Delays

{¶ 33} Appellants allege that Whitt Sturtevant caused significant delays in the project when it made changes to the work in suite 2020 that required new plans and new permits.  With respect to these allegations, the trial court found as follows:

> Changes during a construction project are normal.  The primary reason for delays in the permitting process and

---

[8] NC Plaza relied on the provisions of "Exhibit D" relating to tenant delays, which provides as follows:

> (c)  "Tenant Delay" shall be any of the following:
> (i)  Tenant's failure to timely furnish information requested by Landlord;
> (ii)  Tenant's failure to timely approve the Plans and Specifications, the Work or any revised costs after submittal by Landlord for such approval;
> (iii)  Tenant's request for or use of unique materials, finishes or installations or construction procedures which are substantially different from that which is standard or customary for the Building or from that shown in any plan which Tenant has heretofore approved;
> (iv)  Tenant's failure to pay for such portion of the Work, if any, as and when payable by Tenant hereunder;
> (v)  Tenant's changes in the Work (notwithstanding Landlord's approval of any such changes);
> (vi)  The entry by Tenant or any contractors for Tenant in or about the Premises or Building that causes a substantial delay; or
> (vii)  Any other act, omission or delay by Tenant, its agents or contractors or persons employed by any of such persons delaying substantial completion of the Work.

proceeding with the project were errors by the landlord's architect and the landlord's contractor; not changes requested by Whitt Sturtevant. Defendants' claim that Whitt Sturtevant delayed the project is not supported by the evidence. While defendants claim that changes in the small kitchen area and conference room delayed the project, those requests were made by Whitt Sturtevant and approved by the defendants only a month after the lease was signed [and] were included as part of the original plans that Roslovic submitted for permit approval. Those changes did not delay the project. Based on the evidence presented, including the credibility of the witness who testified, the court finds that the fault for the delay in commencing the project lies squarely at the feet of Rick Aronhalt and the defendants.

(Sept. 8, 2014 Decision, 14-15.)

{¶ 34} The weight of the evidence shows that Whitt Sturtevant requested just two changes that could have caused delay. The first was the design change to the wall in the break room/conference room that Whitt Sturtevant requested in early April 2012. Aronhalt testified that Whitt Sturtevant wanted a curved wall. The evidence shows, however, that this change was incorporated into the original plans and specification drafted by WSA in early April. Aronhalt testified that he received those plans and specifications from WSA on April 9, 2012. The second change occurred shortly thereafter when Whitt Sturtevant requested a change to the same wall. According to Aronhalt, Potter directed Frank Weaver to move one of the interior walls and return it to a rectangular shape. WSA revised the plans and specifications and Aronhalt submitted them to the city of Columbus for approval on or about April 26, 2012.

{¶ 35} Whitt's testimony constitutes competent, credible evidence to support the trial court's finding that WSA incorporated the design changes Whitt Sturtevant requested in April 2012 into the original plans and specifications submitted to the city of Columbus on or about April 26, 2012. Thus, the evidence supports the trial court's conclusion that the design changes requested by Whitt Sturtevant did not delay the project.

{¶ 36} Aronhalt claimed that Whitt and Potter made additional changes to the design during the meeting on July 26, 2012 and that those changes significantly delayed the project. Specifically, Aronhalt testified that requested changes to the lighting fixtures and wall treatments arising out of the July 26, 2012 meeting required WSA to revise its

original construction plans and specifications and to obtain a new building permit from the city of Columbus.

{¶ 37} Whitt's testimony contradicted Aronhalt's regarding the reason a new permit was required. According to Whitt, WSA failed to include certain electrical outlets in the first set of plans and specifications submitted to the city of Columbus in April. When WSA acknowledged its error and when Whitt Sturtevant learned that a new permit would be required, Whitt took the opportunity to suggest a change to slot lighting fixtures. According to Whitt, had new permits not been required to correct WSA's error, he would not have requested the change in the lighting fixtures. The trial court obviously believed Whitt's version of the events to be more credible than Aronhalt's. As noted above, "the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co.* at 80.

{¶ 38} Whitt also testified that Roslovic mistakenly believed that existing light fixtures could be reused in the renovation but later discovered that they could not be reused. Consequently, Whitt Sturtevant was required to select new fixtures. Additionally, Whitt testified that Roslovic had informed him that the wood flooring product selected by Whitt Sturtevant was appropriate for use in the project only to find out later that the product could not be used. Thus, there is additional evidence that errors and omissions of the contractor resulted in delays.

{¶ 39} Furthermore, the testimony of Whitt and Gregory, if believed, supports the trial court's finding that delays in the project were caused by Aronhalt's failure to diligently perform his role as construction manager. There is no dispute that lease execution occurred on March 14, 2012, yet construction in suite 2020 did not commence until June 12, 2012. Although Aronhalt testified that design changes requested by Whitt Sturtevant and delays associated with obtaining a permit from the city of Columbus were the reasons for the slow start to the project, the weight of the evidence does not support that claim. Moreover, Gregory acknowledged on cross-examination that in August 2012 he expressed concerns to Goldner that Aronhalt had not been taking control of the project and had not been communicating project expectations and schedules to Whitt Sturtevant.

{¶ 40} The lease states that "[l]andlord shall require its contractors and agents to perform Landlord's Work in a good and workmanlike manner." The lease also requires that "[l]andlord shall proceed with reasonable diligence to cause the Work to be substantially completed." (Lease Agreement, Exhibit D.) There is competent, credible evidence to support the conclusion that appellants breached both of these lease provisions.

{¶ 41} We note that the trial court expressly based its findings and conclusion on its assessment of witness credibility. The trial court obviously believed Whitt's testimony and disbelieved both Aronhalt and Goldner. As noted above, we generally defer to the trial court in such matters because "the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Id.*

{¶ 42} Moreover, the record contains support for the trial court's credibility determination. For example, the evidence supports the trial court's finding that Aronhalt falsified a commencement agreement that was material to the lease. Additionally, even though the only reasonable interpretation of the lease is that NC Plaza and Goldner had the burden to proceed with the renovation project, Goldner insisted that the lease agreement required Whitt Sturtevant to complete the renovations in suite 2020. He also testified that Whitt Sturtevant voluntarily vacated the leased premises when the undisputed evidence established that Aronhalt ordered the locks changed.

### 4. Soaring Costs

{¶ 43} Appellants also claim that Whitt Sturtevant failed to timely approve Roslovic's proposals for change orders and failed to pay invoices for the work to be performed. According to appellants, these failures caused appellants to cease work on the renovation project. With regard to this claim, the trial court made the following findings:

> Defendants' claims that plaintiff was required to pay whatever sum the defendants chose to invoice for the construction project is faulty. The evidence is clear that Rick Aronhalt failed to respond to the numerous requests for information on the running cost of a project that initially was estimated at $40,800.00. When Aronhalt finally provided some information, the projected cost had skyrocketed to over three times the original estimate and was for matters that had not

> yet begun much less "substantially completed". It is equally clear that the plaintiff had the right to question the amounts and specifics of the proposed cost. Refusing to simply pay a sum that was shown to be inaccurate is not a breach of the terms of the lease and the landlords bullying tactics did not make it so.

(Sept. 8, 2014 Decision, 14.)

{¶ 44} Competent, credible evidence supports the trial court's findings and conclusions. There is no dispute that Roslovic's bid on the project was $40,800 and that the lease agreement provides a construction allowance for the project of $49,750. However, when WSA drafted the original plans and specifications on April 26, 2012, Roslovic's price jumped to $63,509.57. Although Aronhalt claims that he orally provided this information to Potter, the trial court found otherwise, and the weight of the evidence supports the trial court's findings.

{¶ 45} There are numerous e-mail correspondence admitted as evidence in this case that corroborate Whitt's testimony that he and Potter began requesting pricing information from Aronhalt as early as May 1, 2012, just after the plans and specifications were submitted to the city of Columbus. The weight of the evidence also supports a finding that Whitt Sturtevant did not receive any pricing information until August 6, 2012, when Aronhalt provided Whitt with Roslovic's proposal in the total amount of $127,859. One does not need to be an expert in construction management to understand that providing updated pricing information to the principals is material to the transaction.

{¶ 46} The evidence also supports the trial court's conclusion that Whitt Sturtevant had a reasonable justification for refusing to pay invoices submitted to it by Aronhalt. As noted above, the initial proposal submitted to Whitt Sturtevant in August listed a total price of $127,859. After Whitt pointed out some obvious errors in the line items of the proposal and in Roslovic's allocation of costs among the parties, Roslovic issued a new proposal with a price of $96,316. However, when Aronhalt presented Whitt Sturtevant with the first "invoice" in September 2012, Aronhalt demanded immediate payment of $114,547. Whitt described the proposals it was being asked to approve and the amounts it was expected to pay as a "continual moving target." (Tr. 95.)

{¶ 47} The relevant language of the lease provides as follows:

> Landlord, at Landlord's sole cost and expense, not to exceed Landlord's Contribution as hereinafter defined at Paragraph (e) below, shall perform such work and make such installations in the Premises ("Landlord's Work" or the "Work") as are designated in the Plans and Specifications attached hereto and incorporated herein by reference. *Work requested by Tenant in excess of Landlord's Contribution shall be at Tenant's sole cost and expense.*

(Emphasis added.) (Lease Agreement, Exhibit D.)

{¶ 48} Whitt's understanding of the lease agreement was that Whitt Sturtevant was responsible for only those costs associated with its changes to the work set forth in the plans and specifications drafted and approved in April 2012. Whitt testified that the parties contemplated that Roslovic could deliver permanent office space in accordance with those plans and specifications at an approximate cost of $49,750. Whitt understood that any work required to be performed pursuant to the plans and specifications drafted in April 2012 was the sole responsibility of NC Plaza, regardless of the amount Roslovic ultimately charged for that work.

{¶ 49} The language of the lease supports Whitt's understanding in that the lease requires Whitt Sturtevant to pay for only the extra "work" it requests, not all costs incurred in excess of the landlord's construction allowance.[9] In accordance with its understanding of the lease agreement, Whitt Sturtevant raised legitimate questions about the allocation of project costs between Whitt Sturtevant and NC Plaza. For example, an issue regarding ceiling tiles arose during the project. The single page floor plan from which prospective contractors bid the project clearly shows that new ceiling tiles are to be installed in suite 2020. Yet, when NC Plaza executed its contract with Roslovic, the cost of new ceiling tiles was not included in the work. Roslovic acknowledged that the plans called for new ceiling tiles but that Roslovic contracted to reuse the old ceiling tiles. He estimated the cost of new ceiling tiles at roughly $8,000 to $9,000. Aronhalt's insistence that Whitt Sturtevant either accept Roslovic's plan to reuse the existing tiles or foot the bill for new ceiling tiles is inconsistent with the lease agreement and smacks of bad faith.

---

[9] Whitt testified: "It was apparent by the time we got this September 20th invoice that the contractor, whatever they did to bid this project, was woefully inadequate." (Tr. 670.)

{¶ 50} The trial court found that the significant delays and soaring project costs of the project were not the fault of Whitt Sturtevant, and the weight of the evidence supports the trial court's findings and conclusions. Though the trial court was not required to determine the precise cause of the delays and soaring project costs in order to determine that NC Plaza materially breached the lease agreement, the trial court went on to conclude that the delays and soaring costs of the project were the fault of NC Plaza and its agents. There is competent, credible evidence in the record to support the trial court's findings and conclusions.

### 5. Eviction

{¶ 51} The lease contains a provision requiring NC Plaza to provide written notice of default and an opportunity to cure prior to the termination of the lease. Section 21(a) of the lease agreement, entitled "Default," provides:

> If (i) Tenant fails to pay when due any rent, or any other sums required to be paid hereunder by Tenant * * * and Tenant shall fail to cure said default within twenty (20) days after receipt of written notice thereof by Landlord.

(Lease Agreement, 16.)

{¶ 52} The trial court found that appellants did not give Whitt Sturtevant the required notice prior to changing the locks to suite 2020 on November 13, 2012. The evidence in the record supports the trial court's finding. Although Aronhalt testified that the September 20, 2012 "Invoice" provided adequate notice of default, our review of the invoice reveals nothing that would alert Whitt Sturtevant that NC Plaza had declared a default of any particular lease term. Thus, the record supports the trial court's conclusion that appellants materially breached the lease agreement and wrongfully evicted Whitt Sturtevant from the premises.[10]

{¶ 53} "Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *C.E. Morris Co.* at syllabus; *Shelly Holding*

---

[10] To the extent that Ohio law recognizes wrongful eviction as a cause of action in tort, Whitt Sturtevant did not plead such a cause nor did the trial court treat Whitt Sturtevant's claim for wrongful eviction as anything other than a cause of action sounding in contract.

*Co.* For the foregoing reasons, appellants' second and third assignments of error are overruled.

### B. Appellants' Seventh Assignment of Error

{¶ 54} In appellants' seventh assignment of error, appellants argue that the trial court erred in awarding compensatory damages of $39,564.46 for the breach of the lease agreement. We disagree.

{¶ 55} Appellants' primary challenge to the award of compensatory damages for breach of the lease is Whitt Sturtevant's claim of business interruption damages. Whitt testified that as a result of the breach of the lease and subsequent eviction, Whitt Sturtevant's lawyers were prevented form producing billable work for a total of three business days: the day of the eviction, the day Whitt Sturtevant moved into their new office, and the first day after moving into the new office. Whitt testified that he and the other lawyers spent that first day in their new office working on administrative tasks rather than billable hours. Whitt came up with the $32,640 figure for business interruption by calculating an average rate per billable hour for each of Whitt Sturtevant's six lawyers and then multiplying that rate by eight billable hours per day for each lawyer over three days.

{¶ 56} Appellants argue that because Whitt did not provide any documentary evidence corroborating his testimony that Whitt Sturtevant had sufficient client work to account for these billable hours, the trial court abused its discretion when it awarded business interruption damages based solely on Whitt's testimony. Appellants have not referred this court to any legal authority that requires such corroboration nor is this court aware of any. Moreover, appellants had the opportunity to raise the lack of corroboration in their cross-examination.

{¶ 57} Our review of the record shows that Whitt's testimony, if believed, is sufficient to satisfy Whitt Sturtevant's burden of proving both the existence and amount of its business interruption damages with a reasonable degree of certainty. *Beever*; *Moton.* Because there is competent, credible evidence to support the award of compensatory damages, we will not overturn the trial court's award of damages for business interruption. *See Shaw*; *C.E. Morris Co.*; *Hofner.*

{¶ 58} With respect to the remainder of the compensatory damages awarded to Whitt Sturtevant for NC Plaza's breach of the lease agreement, we note that appellants' seventh assignment of error does not challenge the award of compensatory damages for the conversion claim.  Thus, NC Plaza has not challenged the damages awarded to Whitt Sturtevant as compensation for the items of personal property that were left behind when it evicted Whitt Sturtevant.  These items include rented office furniture, a rented copier, and lighting fixtures that its supplier delivered to the site but never returned.  Whitt produced invoices corresponding to each of these items, and he testified that Whitt Sturtevant paid the vendors.

{¶ 59} Whitt also produced invoices related to the services of movers, an interior decorator whose services were rendered valueless after the eviction, a company that installed computer wiring in suite 2020, and a company that installed electrical conduit in suite 2020.  Whitt testified that Whitt Sturtevant also incurred expenses associated with changing the firm's website and office stationary in order to reflect the change of address.

{¶ 60} Appellants do not dispute Whitt's testimony that Whitt Sturtevant incurred these expenses as a result of the alleged breach of the lease agreement or that such damages are recoverable.  Rather, appellants argue that Whitt Sturtevant failed to produce evidence that it had paid "five of the invoices at issue—totaling $6,924.46." (Appellants' Brief, 52.)  Appellants do not specifically identify the challenged invoices.

{¶ 61} " 'The fundamental rule of the law of damages is that the injured party shall have compensation for all of the injuries sustained.' " *Landis v. William Fannin Builders, Inc.*, 10th Dist. No. 10AP-568, 2011-Ohio-1489, ¶ 37, quoting *Fantozzi v. Sandusky Cement Prods. Co.*, 64 Ohio St.3d 601, 612 (1992).  Thus, in both contract and tort actions, the appropriate measure of damages is that which will make the injured party whole.  *Id.*, citing *Sinclair Community College Dist. Bd. of Trustees v. Farra*, 186 Ohio App.3d 662, 2010-Ohio-1130, ¶ 23 (2d Dist.); *Safe Auto Ins. Co. v. Hasford*, 10th Dist. No. 08AP-249, 2008-Ohio-4897, ¶ 28.

{¶ 62} Even if Whitt did not specifically state that Whitt Sturtevant had paid all the invoices he identified, his testimony establishes to a reasonable degree of certainty that Whitt Sturtevant incurred these expenses as a consequence of NC Plaza's breach of the lease agreement and that Whitt Sturtevant is contractually obligated to pay them.  Thus,

the trial court's award of damages for these expenses is necessary to make Whitt Sturtevant whole, evidence of payment notwithstanding.

{¶ 63} Accordingly, appellants' seventh assignment of error is overruled.

### C. Appellants' Fourth Assignment of Error

{¶ 64} In appellants' fourth assignment of error, appellants argue that the trial court erred in finding appellants liable for conversion. We disagree.

{¶ 65} Conversion is "the wrongful exercise of dominion over property to the exclusion of the rights of the owner, or withholding it from his possession under a claim inconsistent with his rights." *Joyce v. Gen. Motors Corp.*, 49 Ohio St.3d 93, 96 (1990), citing *Zacchini v. Scripps-Howard Broadcasting Co.*, 47 Ohio St.2d 224, 226 (1976). *See also Jarupan v. Hanna*, 173 Ohio App.3d 284, 2007-Ohio-5081, ¶ 15, citing *RFC Capital Corp. v. EarthLink, Inc.*, 10th Dist. No. 03AP-735, 2004-Ohio-7046, ¶ 61 (plaintiff must prove three elements: "(1) a defendant's exercise of dominion or control (2) over a plaintiff's property (3) in a manner inconsistent with the plaintiff's rights of ownership"). "If a defendant comes into possession of property lawfully, a plaintiff must prove two additional elements: (1) that she demanded the return of the property after the defendant exercised dominion or control over the property, and (2) that the defendant refused to deliver the property to the plaintiff." *Id.*, citing *RFC Capital Corp.* at ¶ 61.

{¶ 66} Whitt testified that when NC Plaza evicted Whitt Sturtevant from the premises on November 13, 2012, Aronhalt permitted Whitt Sturtevant employees to re-enter the premises to retrieve client files and personal computers but nothing else. Having determined that NC Plaza materially breached the lease agreement and wrongfully evicted Whitt Sturtevant, it necessarily follows that appellants did not lawfully come into possession of any of the property Whitt Sturtevant was prevented from retrieving.

{¶ 67} According to Whitt, the property left behind included leased office furniture and equipment as well as artwork and office supplies. Whitt testified that Aronhalt did not permit Whitt Sturtevant to re-enter the premises to retrieve the remainder of its property "for eight months or so." (Tr. 113.) Though NC Plaza has claimed that Whitt Sturtevant voluntarily vacated the leased premises, the trial court rejected that claim, and the weight of the evidence supports the trial court's conclusion.

{¶ 68} For the foregoing reasons, we find that Whitt Sturtevant presented competent, credible evidence that NC Plaza, by and through Goldner, wrongfully withheld Whitt Sturtevant from possession of its property under a claim inconsistent with Whitt Sturtevant's rights.  Thus, the trial court did not err when it found in favor of Whitt Sturtevant on its conversion claim, and we overrule appellants' fourth assignment of error.

### D.  Appellants' Fifth and Sixth Assignments of Error

{¶ 69} Inasmuch as appellants' fifth and sixth assignments of error concern the trial court's ruling on the defamation claim, we will consider them together.

{¶ 70} In their fifth assignment of error, appellants contend that the trial court erred in finding NC Plaza and Goldner liable for defamation per se.  In their sixth assignment of error, appellants contend that the trial court erred when it awarded Whitt Sturtevant $100,000 in compensatory damages for defamation per se.  Because we find that the false statements of fact contained in the notice to leave the premises were not per se defamatory, we sustain appellants' fifth and sixth assignments of error.

{¶ 71} "Defamation is the unprivileged publication of a false and defamatory matter about another." *McCartney v. Oblates of St. Francis deSales*, 80 Ohio App.3d 345, 353 (6th Dist.1992), citing *McCarthy v. Cincinnati Enquirer, Inc.*, 101 Ohio App. 297 (1st Dist.1956).  "A defamatory statement is generally defined 'as a false * * * publication, made with some degree of fault, reflecting injuriously on a person's reputation, or exposing a person to public hatred, contempt, ridicule, shame or disgrace, or affecting a person adversely in his or her trade, business or profession.' " *Okereke v. Cent. State Univ.*, 10th Dist. No. 00AP-686 (Mar. 29, 2001), quoting *A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 73 Ohio St.3d 1, 7 (1995).  *See also Dale v. Ohio Civ. Serv. Emp. Assn.*, 57 Ohio St.3d 112, 117 (1991).  To succeed on a defamation claim, a plaintiff must ordinarily establish: (1) a false statement, (2) about the plaintiff, (3) published without privilege to a third party, (4) with fault of at least negligence on the part of the defendant, and (5) the statement was either defamatory per se or caused special harm to the plaintiff.  *Watley v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 07AP-902, 2008-Ohio-3691, ¶ 26; *McPeek v. Leetonia Italian-Am. Club*, 7th

Dist. No. 06 CO 72, 2007-Ohio-7218, ¶ 8. *See also Savoy v. Univ. of Akron*, 10th Dist. No. 13AP-696, 2014-Ohio-3043, ¶ 18.

{¶ 72} "[A] determination of whether a publication is libelous involves a two-step process: first, whether there are false statements on the face of the writing, and hence, the libel is libel *per se*; second, whether through interpretation and innuendo the writing is libelous and is libel *per quod*." (Emphasis sic.) *Sullivan v. Tucci*, 69 Ohio App.3d 20, 22-23 (10th Dist.1990), citing *Hampton v. Dispatch Printing Co.*, 10th Dist. No. 87AP-1084 (Sept. 13, 1988). "Libel per se" is defined as something actionable in itself, i.e., it is libel by the very meaning of the words used. *Stokes v. Meimaris*, 111 Ohio App.3d 176, 184 (8th Dist.1996); *Kanjuka v. Metrohealth Med. Ctr.*, 8th Dist. No. 79995, 2002-Ohio-6803. In order to be considered libel per se, the words used in the publication must fall into one of three categories: "(1) the imputation of a charge of an indictable offense involving moral turpitude or infamous punishment; (2) the imputation of some offensive or contagious diseases calculated to deprive the person of society; or (3) having the tendency to injure the plaintiff in his trade or occupation." *Williams v. Gannett Satellite Information Network, Inc.*, 1st Dist. No. C-040635, 2005-Ohio-4141, ¶ 8, citing *Schoedler v. Motometer Gauge & Equip. Corp.*, 134 Ohio St. 78, 84 (1938). In cases of libel, the question of whether the publication complained of is libelous per se is a question of law for the trial court. *Id. See also Moore v. P.W. Publishing Co.*, 3 Ohio St.2d 183 (1965).

{¶ 73} The trial court found that the statements in the notice to leave were defamatory per se inasmuch as they tended to falsely impugn the legal ethics of Whitt Sturtevant and the attorneys associated with the firm. Specifically, the trial court stated:

> Perhaps the most troubling portion of the notice to leave the premises is the statement that the Whitt Sturtevant law firm was guilty of a "DELIBERATE AND INTENTIONAL VIOLATION OF THE LEASE." That statement alone accuses Whitt Sturtevant, L.L.P. Mark Whitt and Albert Sturtevant of unethical behavior under the code of professional responsibility for attorneys.

(Emphasis sic.) (Sept. 8, 2014 Decision, 18.)

{¶ 74} We do not agree that the false statements of fact in the notice to leave the premises concern Whitt Sturtevant in its specific trade or profession. Thus, the statements are not per se defamatory.

{¶ 75} In *Bigelow v. Brumley*, 138 Ohio St. 574 (1941), an "official argument" distributed to voters by the Office of the Secretary of State referred to the clergyman who had sponsored proposed tax legislation as a "paid lobbyist for the Single Tax Movement." Although the clergyman in that case, Herbert Bigelow, had sponsored the proposed legislation before the General Assembly, Bigelow was not a paid lobbyist. Bigelow brought a defamation action against the governor of the General Assembly, alleging that the false statement was per se defamatory because it injured him in his trade or profession. The Supreme Court of Ohio disagreed. In its decision, the court expressed its reasoning as follows:

> We are of the opinion that, under the circumstances disclosed in the amended petition, the fact that the plaintiff is a clergyman should not entitle him to special consideration. It is, of course, true that words that will adversely affect a man in his occupation are relative to the nature of that occupation. Words that might cause great harm to a clergyman in his calling would not do so to a non-professional man. In the present case, however, the amended petition shows that plaintiff had not restricted his activity to his ministry, but had entered the political arena as author of the "Bigelow Amendments."
>
> [I]t is apparent that the statement complained of what was not written about the plaintiff with regard to his activities as a member of the clergy. It has been held by this court that "Words, charging a clergyman with drunkenness, *when spoken of and concerning him in his office or calling*, are actionable *per se*." *Hayner v. Cowden*, 27 Ohio St., 292. (Italics ours.) *In the case at bar, the statement that plaintiff was a "paid lobbyist for the Single Tax Movement" was not published of and concerning the plaintiff as a clergyman, but as sponsor of the "Bigelow Amendments."*[11]

(Emphasis added.) *Id*. at 591-92.

---

[11] The Supreme Court also held that an absolute privilege did not attach to the allegedly defamatory statements. *Id.* at 593.

{¶ 76} For similar reasons to those articulated by the Supreme Court in *Bigelow*, we find that the statement that Whitt Sturtevant committed "deliberate and intentional violations of the lease," was not made "of and concerning" Whitt Sturtevant or its attorneys as legal professionals. (Plaintiff's exhibit No. 39; *Bigelow* at 592.) First, it is not evident from the face of the notice to leave that Whitt and Sturtevant are attorneys or that Whitt Sturtevant is a law firm. Whitt Sturtevant is identified only as an "LLP" in the notice.[12] Although Mark Whitt and Albert Sturtevant are named in the notice to leave, the notice does not use the designation "Esq." nor does it otherwise identify them as attorneys. Second, contrary to the trial court's determination, the notice does not impugn the legal ethics of Whitt Sturtevant or the members of the firm. Although the notice falsely portrays Whitt Sturtevant as a business partnership that has committed unspecified "deliberate intentional violations of lease," such a statement does not necessarily raise a question regarding Whitt's or Sturtevant's moral or ethical fitness to practice law. (Plaintiff's exhibit No. 39.) Nor does the statement permit the reader to conclude that the attorneys associated with Whitt Sturtevant behave unethically in their representation of their clients or in their dealings with the court.

{¶ 77} When Whitt testified regarding the nature of injury suffered by Whitt Sturtevant, he stated that he felt embarrassed that the firm had been evicted and that it was "destabilizing internally and externally." (Tr. 131.) He did not testify that he understood the notice to leave as an assertion that Whitt Sturtevant and the lawyers associated with the firm lacked professional ethics. Because we find that the false statements in the notice to leave do not concern Whitt Sturtevant's specific trade or profession, the statements are not defamatory per se.

{¶ 78} Furthermore, to the extent that the notice to leave disparaged Whitt Sturtevant either in a general business context or in its capacity as a commercial tenant, "[t]here can be no maintenance of an action for libel *per quod* in the absence of special damages." (Emphasis sic.) *Hampton*, citing *Bigelow*. "Special damages are those direct financial losses resulting from the plaintiff's impaired reputation." *Id.*, citing *Wheeler v.*

---

[12] Whitt Sturtevant is a limited liability partnership under R.C. 1776.81.

*Yocum*, 10th Dist*. No. 85AP-828 (Mar. 25, 1986). *See also Peters v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 14AP-1048, 2015-Ohio-2668.

{¶ 79} Whitt Sturtevant presented no evidence of any direct financial loss arising out of the false statements in the notice. There was no evidence that the false statements discouraged any commercial landlord or any other business person from dealing with Whitt Sturtevant. The only client who reportedly saw the notice to leave has remained a client of Whitt Sturtevant, and the firm was able to secure a lease for suitable new office space in another Columbus bank building within a matter of days.

{¶ 80} Based on the foregoing, even if we consider the false statements in the notice to leave to be defamatory as they relate to Whitt Sturtevant in a general business context or in its capacity as a commercial tenant, Whitt Sturtevant cannot recover for defamation in the absence of special harm. Accordingly, appellants' fifth assignment of error is sustained.[13] Additionally, having determined that Whitt Sturtevant cannot prevail on its claim of business defamation, we find that Whitt Sturtevant is not entitled to any award of compensatory damages for that claim. Therefore, we also sustain appellants' sixth assignment of error.

### E. Appellants' Eighth Assignment of Error

{¶ 81} In their eighth assignment of error, appellants contend that the trial court abused its discretion when it awarded punitive damages. We disagree.

{¶ 82} Punitive damages may be awarded on a finding of actual malice. *Thomas v. Columbia Sussex Corp.*, 10th Dist. No. 10AP-93, 2011-Ohio-17, ¶ 44. Actual malice is defined as "(1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, *or* (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." (Emphasis sic.) *Preston v. Murty*, 32 Ohio St.3d 334 (1987), syllabus. "It is settled that punitive damages may be awarded only upon 'clear and convincing' evidence." *382 Capital, Inc. v. Corso*, 10th Dist. No. 99AP-156 (Dec. 28, 1999), quoting *Cabe v. Lunich,* 70 Ohio St.3d 598, 601

---

[13] We need not specifically address appellants' arguments based on the alleged lack of publication and the existence of a privilege.

(1994).  The trial court made the following findings in support of the award of punitive damages:

> [D]efendants knew at the time of the eviction that the temporary furniture, equipment and other furnishings defendants seized had been rented by Whitt Sturtevant. Whitt Sturtevant demanded the release of the property.  No matter the terms of the lease between Whitt Sturtevant and the defendants, the defendants had to know that they did not have superior rights to the actual owner of the rental items and had no claim or right to seize the property.  Despite this bedrock concept, the defendants held the rental property for nine months before they finally agreed to release it.  During that time, plaintiff was required to continue to pay almost $10,000 to the owner of the rented furniture and equipment.  The defendants' conduct in seizing and retaining property that it had no legal right to seize shows a "conscious disregard for the rights and safety [of] other persons that has a great probability of causing substantial harm."  *Preston v. Murty*, *supra*; *Digital & Analog Design* [*v. N. Supply Co.*, 44 Ohio St.3d 36 (1989)].[14]
>
> * * *
>
> [D]espite having been the party responsible for drafting the lease.  The lease places the responsibility for the renovation-construction work squarely upon the landlord.  Yet, Arthur Goldner continued to insist that Whitt Sturtevant was responsible for managing the renovation-construction project in Suite 2020.  When the plaintiff expressed concern that the project was not moving and prodded Goldner to take some action to move things along, the defendants' response was to blame the tenant for the delay.  Part and parcel of the conduct of the defendants during this time was the manufacture of a forged document, the "Commencement Agreement", a document which Rick Aronhalt altered.  Knowing that the landlord, not the tenant, was responsible for the renovation-construction product and knowing that a forged document was used to try to force the plaintiff into submission, the landlord blithely published a document that contained false statements about the plaintiff.  The court finds that the defendants consciously disregarded the rights of Whitt Sturtevant under the lease and that the defendants'

---

[14] *Digital & Analog* was rejected on other grounds in *Zoppo v. Homestead Ins. Co.*, 71 Ohio St.3d 552, 557 (1994).

> conscious disregard of those rights had a great probability of causing Whitt Sturtevant substantial harm.

(Sept. 8, 2014 Decision, 24-25.)

{¶ 83} The record contains clear and convincing evidence to support the trial court's findings. As noted above, appellants evicted Whitt Sturtevant from the premises without a reasonable justification and without adequate notice. By locking Whitt Sturtevant out of the leased premises and refusing to allow the firm to recover its property for roughly eight months, appellants knowingly subjected Whitt Sturtevant to the monetary losses discussed in connection with appellants' second, third, and fourth assignments of error. Such conduct evidences a conscious disregard for Whitt Sturtevant's rights under circumstances where there was a great probability of causing substantial financial harm to Whitt Sturtevant. Additionally, while we have held that the statements published in the notice to leave the premises are not defamatory per se, the evidence shows that the statements of fact contained in the notice were false. Both Goldner and Aronhalt also admitted that they published the false statements in an effort to force Whitt Sturtevant to pay the sums it claimed they owed for the renovation project. Thus, the evidence shows that Aronhalt and Goldner were motivated to publish the notice to leave the premises by ill will or a spirit of revenge. The trial court also found that when Whitt Sturtevant resisted Aronhalt's demands, Aronhalt resorted to "bullying tactics" in an effort to coerce Whitt Sturtevant into approving Roslovic's proposals and paying its invoices, whatever the charges. (Sept. 8, 2014 Decision, 14.) Such conduct is further evidence of ill will or a spirit of revenge.

{¶ 84} There is also clear and convincing evidence that Aronhalt falsely claimed that Whitt agreed to the September 1, 2012 commencement date. At a minimum, the evidence shows that Aronhalt knowingly altered a commencement date agreement bearing Whitt's signature and attempted to pass the document off as legitimate. The evidence shows that Aronhalt did so in order to secure an unfair commercial advantage for appellants in their dealings with Whitt Sturtevant. Such conduct provides an independent justification for award of punitive damages. *See Thomas v. Mitchell*, 6th Dist. No. H-93-17 (Dec. 17, 1993) (defendant's conduct in maliciously forging an American Kennel Club registration form in connection with the sale of canine stud services justified

an award of punitive damages); *Vinci v. Ceraolo*, 79 Ohio App.3d 640, 649 (8th Dist.1992) (defendant's conduct in deliberately forging documents evidencing ownership in plaintiff-corporation justified award of punitive damages and attorney fees in corporation's action seeking replevin of an automobile).

{¶ 85} In the final analysis, the trial court's findings regarding the conduct of appellants supports an award of punitive damages based on malice. We find that the record contains clear and convincing evidence to support the trial court's findings. Accordingly, we hold that the trial court did not abuse its discretion when it awarded punitive damages. Appellants' eighth assignment of error is overruled.

### F. Appellants' Ninth Assignment of Error

{¶ 86} In appellants' ninth assignment of error, appellants contend that the trial court erred by awarding attorney fees. We disagree.

{¶ 87} As a general rule, a prevailing party may not recover attorney fees unless the losing party acted in bad faith, vexatiously, wantonly, obdurately, or for oppressive reasons. *State ex rel. Kabatek v. Stackhouse*, 6 Ohio St.3d 55 (1983); *Sorin v. Warrensville Hts. School Dist. Bd. of Edn.*, 46 Ohio St.2d 177 (1976). An aggrieved party may also recover reasonable attorney fees where the award of punitive damages is proper. *Beavers v. Knapp*, 10th Dist. No. 07AP-612, 2008-Ohio-2023, ¶ 71. A trial court's determination in regard to an award of attorney fees is generally reviewed under the abuse of discretion standard. *Miller v. Grimsley*, 10th Dist. No. 09AP-660, 2011-Ohio-6049.

{¶ 88} In this assignment of error, appellants do not challenge the amount of the fee award. Rather, they dispute the trial court's finding that their conduct justified an award of punitive damages. Having determined that the trial court did not err when it found that appellants had engaged in conduct justifying an award of punitive damages, Whitt Sturtevant is entitled to an award of reasonable attorney fees. *Beavers* at ¶ 71. Consequently, appellants' argument is without merit.

{¶ 89} The trial court also cited appellants' frivolous conduct during this litigation and appellants' abuses of the discovery process as an alternative basis for an award of attorney fees. R.C. 2323.51(A) defines frivolous conduct, in relevant part, as follows:

(1) "Conduct" means any of the following:

> (a) The filing of a civil action, *the assertion of a claim, defense, or other position in connection with a civil action*, the filing of a pleading, motion, or other paper in a civil action, including, but not limited to, a motion or paper filed for discovery purposes, or the taking of any other action in connection with a civil action;
>
> * * *
>
> (2)  "Frivolous conduct" means either of the following:
>
> * * *
>
> (iii) The conduct consists of allegations or other *factual contentions that have no evidentiary support* or, if specifically so identified, are not likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

(Emphasis added.)

{¶ 90} At the September 23, 2014 hearing on Whitt Sturtevant's motion for an award of attorney fees, Whitt was asked about a number of factual allegations contained in appellants' counterclaim, including the allegation that Whitt had personally negotiated the terms of the lease with Goldner at Goldner's offices in Chicago, Illinois, and the allegation that Whitt had made certain representations to Goldner that induced NC Plaza to execute the lease agreement.  Whitt testified that he had never met or spoken with Goldner until Whitt Sturtevant deposed him in this litigation.  In his deposition, Goldner admitted that these allegations had no basis in fact.

{¶ 91} Similarly, Civ.R. 37(C) provides, in relevant part:

> If a party, after being served with a request for admission under Rule 36, fails to admit the genuineness of any documents or the truth of any matter as requested, and if the party requesting the admissions thereafter proves the genuineness of the document or the truth of the matter, he may apply to the court for an order requiring the other party to pay him the reasonable expenses incurred in making that proof, including reasonable attorney's fees.

{¶ 92} In a request for admissions served on appellants by Whitt Sturtevant, appellants were asked to admit that Aronhalt, without Whitt Sturtevant's approval, filled in the commencement date on the commencement date agreement.  Appellants denied

this request.  Appellants also denied changing the locks on suite 2110 and denied that they retained certain items of Whitt Sturtevant's property.  It is difficult to conceive how appellants could have been so mistaken regarding facts that were within the personal knowledge of their primary witnesses.  At trial, the truth of these matters was established.

{¶ 93} Even though these instances of frivolous conduct and failures to admit matters later proven true do not justify an award of all the legal fees incurred by Whitt Sturtevant in this litigation, when we view such conduct in light of the conduct of appellants justifying an award of punitive damages, we cannot say that the trial court abused its discretion when it awarded Whitt Sturtevant attorney fees in the requested amount of $168,519.78.

{¶ 94} Accordingly, appellants' ninth assignment of error is overruled.

### G.  Appellants' First Assignment of Error

{¶ 95} In their first assignment of error, appellants contend that the trial court erred by entering judgment against Goldner both as to the contract claim and the tort claims.

{¶ 96} As a general rule, "[w]here an agent acts for a disclosed principal, in the name of such principal, and within the scope of authority, such agent is ordinarily not liable on the contracts the agent makes."  *Oelberg v. Skaggs,* 10th Dist. No. 97APE10-1383 (June 4, 1998), citing *James G. Smith & Assoc., Inc. v. Everett*, 1 Ohio App.3d 118, 120 (10th Dist.1981).  Further, an agent avoids personal liability by conducting himself or herself with third parties in such a way that those persons are aware they are dealing with the principal, not the agent individually.  *Id.*

{¶ 97} There is no doubt that Whitt Sturtevant knew that Goldner was acting in their capacity as agents of the owner, NC Plaza, with respect to the lease.  Accordingly, under the general rule, Goldner is not liable to Whitt Sturtevant for damages occasioned by the breach of the lease agreement and wrongful eviction.

#### 1.  Tort Claims

{¶ 98}  "An agent is subject to liability to a third party harmed by the agent's tortious conduct.  Unless an applicable statute provides otherwise, an actor remains subject to liability although the actor acts as an agent or an employee, with actual or apparent authority, or within the scope of employment."  Restatement of Agency 3d,

Torts, Section 7.01 (2006). The Supreme Court has stated that an agent who commits a tort is primarily liable for its actions, while the principal is merely secondarily liable. *Comer v. Risko*, 106 Ohio St.3d 185, 2005-Ohio-4559, ¶ 20, citing *Losito v. Kruse*, 136 Ohio St. 183 (1940); *Herron v. Youngstown*, 136 Ohio St. 190 (1940).

{¶ 99} The trial court found appellants liable to Whitt Sturtevant for conversion and business defamation. We have determined that appellants are not liable to Whitt Sturtevant for defamation, but we have upheld the trial court's judgment with respect to Whitt Sturtevant's conversion claim.[15] Under the prevailing law, Goldner is liable to Whitt Sturtevant for conversion. *Comer*. Goldner contends, however, that the exculpation clause in the lease agreement shields it from tort liability to Whitt Sturtevant.

{¶ 100} The lease contains the following relevant provision:

> 33. Exculpation. This Lease is executed by individuals for Landlord, not individually, but solely on behalf of, and as the authorized nominee and agent for Landlord, and in consideration for entering into this Lease, Tenant hereby waives any rights to bring a cause of action against the individuals executing this Lease on behalf of Landlord, and all persons dealing with Landlord must look solely to Landlord's interest in the Property for the enforcement of any claim against Landlord, and the obligations hereunder are not binding upon, nor shall resort be had to the private property of any of, the officers, directors, employees, managers, members or agents of Landlord.

(Lease Agreement, 22.)

{¶ 101} There is nothing in the language of the exculpation clause that purports to shield Goldner from tort liability. Moreover, a cause of action in tort arises in the common law, not in contract. *See Patel v. Krisjal, L.L.C.*, 10th Dist. No. 12AP-16, 2013-Ohio-1202, ¶ 31. While it is reasonable to read the language of the exculpation clause as an effort to disclose the agency status of anyone executing the lease on behalf of NC Plaza, the exculpation clause does not shield Goldner from any tort liability to Whitt Sturtevant that may arise in connection with performance of the lease.

---

[15] Although Whitt Sturtevant now claims that its cause of action for wrongful eviction sounds in tort rather than contract, the complaint sounds in contract, and the trial court's finding that NC Plaza wrongfully evicted Whitt Sturtevant is based on the language of the lease and sounds in contract.

{¶ 102} For the foregoing reasons, we sustain appellants' first assignment of error as to Goldner's liability for breach of contract/wrongful eviction, but overruled as to Goldner's liability for conversion.

### H.  Appellants' Tenth Assignment of Error

{¶ 103} In their tenth assignment of error, appellants argue that the trial court erred when it "dismissed" appellants' breach of contract claim against Whitt Sturtevant. Initially, we note that the trial court did not dismiss the claim.  Rather, the trial court ruled that, based on the findings made in connection with Whitt Sturtevant's claims, appellants' breach of contract claim was without merit.  Accordingly, the trial court entered judgment for Whitt Sturtevant.  Having previously determined that appellants materially breached the lease agreement, we hold that the trial court did not err when it found in favor of Whitt Sturtevant on the counterclaim for breach of contract.  Appellants' tenth assignment of error is overruled.

## V.  CONCLUSION

{¶ 104} Having overruled appellants' second, third, fourth, seventh, eighth, ninth, and tenth assignments of error, but having sustained appellants' fifth and sixth assignments of error and sustained appellants' first assignment of error, in part, we affirm in part and reverse in part the judgment of the Franklin County Court of Common Pleas and remand the matter for further proceedings consistent with this decision.

*Judgment affirmed in part, reversed in part;*
*cause remanded.*

BROWN, P.J., and LUPER SCHUSTER, J., concur.

_____